## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**TEDDY CHESTER, #359559**                 **CIVIL ACTION**

**VERSUS**                                 **NO. 16-17754**

**DARREL VANNOY**                          **SECTION "E"**

### ORDER & REASONS

Before the Court is a Petition for a Writ of Habeas Corpus filed by Petitioner Teddy Chester.[1] Chester was indicted by a Jefferson Parish, Louisiana grand jury on April 25, 1996 for the murder of John Adams. On May 14, 1997, after a two-day trial, the jury found Chester guilty of first degree murder. On May 16, 1997, the jury recommended a sentence of death. Chester unsuccessfully challenged his conviction and sentence in the state courts.[2] Having exhausted all avenues of relief in the state system, Chester filed a federal petition for a writ of habeas corpus under 28 U.S.C. § 2254(d), raising thirty-two claims for relief. For the reasons that follow, the Court grants the writ and orders the State of Louisiana to either retry Chester or release him from state custody within 120 days.[3]

### BACKGROUND

During the guilt phase of Chester's trial, the State theorized that in the early morning of December 27, 1995, between 4:00 and 5:00 a.m., then 18-year-old Teddy

---

[1] R. Doc. 1. This Order refers to documents on this Court's CM/ECF docket as "R. Doc. [#]" and refers to documents on the record before the Louisiana Supreme Court as "R. [#]," which consists of a paper docket only. For reference, the paper docket is split into twenty-six volumes; the bottom right corner of each page in the first eight volumes has been marked for citation purposes—these are the numbers to which "R. [#]" refers. For documents on the paper record that have not been repaginated but are cited to by this Court, the Court attaches those documents to this opinion as Appendix I.

[2] *See State v. Chester* (*Chester I*), 97-2790 (La. 12/1/98), 724 So. 2d 1276 (affirming conviction and death sentence on direct appeal); *State v. Chester* (*Chester II*), 2015-2304 (La. 12/16/16), 208 So. 3d 338 (denying application for post-conviction relief).

[3] Fed. R. App. P. 23(c); *See Hilton v. Braunskill*, 481 U.S. 770, 774 (1987) ("Rule 23(c) undoubtedly creates a presumption of release from custody in [successful habeas] cases . . . ."); *Waiters v. Lee*, 168 F. Supp. 3d 447, 451 & n.5 (E.D.N.Y. 2016).

1

Chester was attempting to sell fake drugs known as "bunk" on Calhoun Street in Kenner, Louisiana, an area known for drug trafficking. Meanwhile, 25-year-old Elbert "Feller" Ratcliff was also on Calhoun Street.[4] Ratcliff was attempting to sell a Guess t-shirt, which he was carrying in a plastic shopping bag, when a cab driven by Adams came to a stop on Calhoun Street. The State asserted that Chester and Ratcliff approached the cab, and Chester got in the rear driver's side seat. According to the State, after Adams refused to buy anything from them, Chester pointed a gun at Adams, demanding money. The State alleged that, when the cab began to accelerate forward, Chester shot Adams in the back of the head, killing him instantly.

Crime scene investigators discovered a bloody plastic bag containing a Guess t-shirt hanging from the inside of the rear driver's side door and fingerprints on several of Adams' business cards, which had been strewn about the front driver's side floorboard. Although the money pouch Adams kept around his neck was missing, Adams had $284.64 elsewhere on his person.[5] A forensic analysis revealed the fingerprints on the business cards were Ratcliff's, which led the police to him.[6] Once in custody, Ratcliff told the police that Chester shot Adams. The police then apprehended Chester. Chester told the police he had been in the back passenger side of the cab and that it was Ratcliff who shot Adams.

Several weeks later, the police conducted a search of Chester's home, recovering a pair of jeans and a Raiders baseball cap with two drops of blood on it: one on the bill and

---

[4] Throughout the trial and during the pre-trial investigation, witnesses discuss "Fella," "Feller," and "Fellow," all of which refer to Ratcliff.

[5] R. 1349.

[6] Angela Horton informed the police that a man called "Feller," one of Ratcliff's nicknames, committed the murder. Based on this information, the police compared the fingerprints found on Adams' business cards to Ratcliff's fingerprints, finding a match. *See* R. Doc. 1-1 at 131–32. Horton did not testify at trial.

one on the inside of the cap.[7] The State's forensic expert concluded that the DNA on the cap was a mixture of blood contributed by multiple people, and that Chester and Adams could not be excluded as contributors to the mixture. Ratcliff's blood was not tested. The State's DNA testing on the cap consumed the entire sample, and no independent evaluation of the State's results could be conducted.

Although there were reddish-brown transfer stains on Chester's jeans, the crime laboratory's testing of the jeans revealed there was no blood on them. The State conducted a search of Ratcliff's home, but discovered no evidence and did not recover the clothes Ratcliff was wearing the night of the murder.

At trial, among other witnesses,[8] the Government presented the testimony of forensic investigator Mark Goldman, Sergeant Dennis Thornton, Quinice Pollard,[9] and Kaprice Pollard. Goldman testified that he did not see any blood spatter present on the rear passenger side of the vehicle. Sergeant Thornton testified that, in his experience as a police officer, blood spatter from a gunshot wound "blows back" in the direction from which it is fired. A stipulation was read to the jury that the blood found on the Raiders

---

[7] The State's DNA analyst described the blood found on the cap as "very small . . . portions . . . very tiny spatters of blood present on the cap." R. 370. Additionally, the exact location of the blood cannot be determined, as the cap was destroyed, and neither the crime lab, nor the DNA lab photographed the cap.

[8] In addition to Goldman, Sergeant Thornton, and the Pollard sisters, the State called: (1) Hazel Adams, the victim's mother, who testified about Adams' good character and that he usually wore a money pouch around his neck, R. 1321–25; (2) Fraser Mackenzie, a physician who does autopsies for the Jefferson Parish Coroner's Office, who testified the victim died of a gunshot wound to the head, R. 1326–32; (3) Deputy Robert Murphy, the Jefferson Parish Sheriff's deputy who first arrived on the murder scene, who testified he "didn't notice any blood" in the back passenger side of the cab, R. 1332–42; (4) Deputy Steven Hymel, the second officer to arrive on the scene, who testified that it was apparent Adams had been shot in the head, R. 1342–46; (5) Deputy William Vieira, a crime scene technician, who testified that he took photographs and recovered evidence from the scene, R. 1355–59; (6) Thomas Victory, the general manager of the King Cab Company, who testified that Adams' cab was dispatched to 713 Calhoun Street at 4:03 a.m., R. 1363, and that the cab was released back to the cab company the day after the murder occurred, *id.*; (7) Deputy Vincent Bosco, the Jefferson Parish Sheriff's deputy dispatched to Kaprice Pollard's house after Chester refused to leave, resulting in Chester's arrest, R. 1384–97; and (8) Detective Ralph Sacks, who was the primary investigator in Adams' murder, R. 1513–73.

[9] The record contains various spellings of Quinice's name. Consistent with the Louisiana Supreme Court's opinion, this Court spells Ms. Pollard's name "Quinice."

cap "was determined to consist of a combination of [Chester's] DNA and the victim's DNA."[10]

The State argued Goldman's and Sergeant Thornton's testimony along with the presence of Adams' blood on Chester's cap proved Chester was the shooter. They adduced that, if Chester had blood spatter on him, he must have been in the rear driver's side of the cab, where the shooter was, when the gun was fired.

With respect to the Pollard sisters' testimony, Quinice testified that Chester had confessed to her that he shot Adams. On cross-examination, defense counsel impeached Quinice, pointing out that, up until two weeks before the trial, Quinice had maintained that on the night of the shooting Chester told her Ratcliff shot Adams. Kaprice testified that she overheard Chester's confession to Quinice on the night of the shooting.

The defense rested after presenting a single witness, Chester's brother, Darren Chester. Darren testified that Quinice was at his apartment the night of December 26, that Kaprice was not there that night, and that Chester had not mentioned Adams' murder to him when Chester came home the next morning. On cross-examination, however, the following exchange took place:

> **Q**: [Y]ou don't know if the night that you just talked about is the same night the cab driver was murdered at all; do you?
> **A**: No, sir. . . .
> **Q**: So we might be talking about two different nights completely; correct?
> **A**: It's probable. . . .
> **Q**: [W]hen was the first time you were asked to remember that December night?
> **A**: It was like about two weeks ago probably.[11]

After over four hours of deliberation, the jury returned a verdict of guilty.

---

[10] R. 1297, 1306. As a result of the stipulation, the State's DNA expert did not testify at trial. R. 1296–97.
[11] R. 1602, 1605. Two weeks prior to trial, May 1, 1997, was approximately four months after the murder took place on December 27, 1996.

During the punishment phase, Defense counsel offered evidence of Chester's mental impairments and volatile family history as mitigating evidence. The prosecution argued Chester knew right from wrong and presented the testimony of Adams's parents, both of whom spoke of the victim's good character.

On May 16, 1997, the jury recommended a sentence of death.[12]

## ANALYSIS

In his habeas petition, Chester raises thirty-two claims of for relief.[13] Each of Chester's claims, and the appropriate standard of review, must be examined separately.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court may not grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court unless the state court adjudication resulted in a decision that was: (1) contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the U.S. Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[14] The state court's findings of fact are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence.[15]

Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."[16] Regarding the "contrary to" clause, the Fifth Circuit has explained:

---

[12] R. 225.
[13] *See* R. Doc. 1 at 2–6.
[14] *See* 28 U.S.C. § 2254(d).
[15] *See* § 2254(e)(1).
[16] *Bell v. Cone*, 535 U.S. 685, 694 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000)).

A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [U.S.] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [U.S.] Supreme Court and nevertheless arrives at a result different from [U.S.] Supreme Court precedent.[17]

Regarding the "unreasonable application" clause, the U.S. Supreme Court has held that "a state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."[18] However, the Supreme Court cautioned:

Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.[19]

As a result, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."[20] The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect

---

[17] *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).
[18] *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).
[19] *Id.* (internal citations and quotation marks omitted).
[20] *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (internal quotation marks and brackets omitted).

one."[21] Accordingly, a state court's merely incorrect application of Supreme Court precedent does not warrant habeas relief.[22]

## I.     Chester's Conflict of Interest Claim

Richie Thompson, the Chief Public Defender for the 24th Judicial District, and Carol Kiff represented Ratcliff. Thompson assigned Chester's case to two members of the Jefferson Parish Indigent Defender Board ("IDB"), Graham da Ponte and Cesar Vasquez. Chester contends that, while representing Ratcliff, Thompson continued to supervise da Ponte and Vasquez in their representation of Chester. Chester argues that, therefore, all the IDB lawyers labored under a conflict of interest.[23]

According to Chester, at the time of his trial, the IDB attorneys shared secretarial staff and investigators, frequently collaborated on cases, and shared computer databases, printers, and photocopiers. Chester alleges the trial court was "put on notice" of this conflict, but failed to appoint non-IDB counsel or seek a waiver of the conflict from Chester, in violation of his right to conflict-free counsel under the Sixth and Fourteenth Amendments.[24] Notably, Chester provided no evidence that the trial court was notified or otherwise should have known of this alleged conflict of interest.[25] Chester raised the issue for the first time in his direct appeal of his conviction.

---

[21] *Bell*, 535 U.S. at 694.

[22] *See, e.g.*, *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

[23] R. Doc. 1 at 61.

[24] *Id.*

[25] To the extent Chester argues the trial court should have known of the potential conflict, "trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Cuyler v. Sullivan*, 446 U.S. 335, 347 (1980); *see also Mickens v. Taylor*, 535 U.S. 162, 192–93 (2002) ("[In *Cuyler*,] [t]his Court held that multiple representation did not raise enough risk of impaired representation in a coming trial to trigger a trial court's duty to enquire further, in the absence of 'special circumstances.' The most obvious special circumstance would be an objection. Indeed, because multiple representation was not suspect per se, and because counsel was in the

Chester contends that "[a]s a result of this conflict," his trial counsel "failed to investigate or present ample evidence of Elbert Ratcliff's culpability" by not: (1) testing "physical evidence against Elbert Ratcliff's DNA"; (2) "present[ing] known witnesses who identified Elbert Ratcliff as the shooter"; and (3) "locat[ing] and present[ing] a witness who observed Elbert Ratcliff fleeing the crime scene with a gun in his hands."[26]

In support of his argument, Chester points to *Holloway v. Arkansas*,[27] in which the U.S. Supreme Court held that when the trial court is alerted to a potential conflict of interest, its failure to "appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel" deprives the defendant of the guarantee of assistance of counsel.[28] When the trial court is made aware of a potential conflict of interest, but does not take corrective action, "prejudice is presumed regardless of whether it was independently shown."[29] When a defendant raises the issue of a conflict of interest *after* trial, however, he must establish that an "actual conflict" of interest adversely affected his lawyer's performance.[30]

"An 'actual conflict' exists when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client."[31] The "'guiding principle in this important area of Sixth Amendment jurisprudence' . . . is whether counsel's allegiance to the accused was compromised by competing obligations owed to

best position to anticipate a risk of conflict, the Court spoke at one point as though nothing but an objection would place a court on notice of a prospective conflict." (Souter, J., dissenting) (internal citations omitted)).
[26] R. Doc. 1 at 63–64.
[27] 435 U.S. 475 (1978).
[28] *Id.* at 484.
[29] *Id.* at 489.
[30] *Cuyler*, 446 U.S. at 348–50.
[31] *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (citing *Strickland v. Washington*, 466 U.S. 668, 692 (1984)).

other clients."[32] In finding an actual conflict of interest existed, the ethical rules "may be informative but are not determinative with respect to whether there is an actual conflict for Sixth Amendment purposes."[33] "Assuming the [petitioner] establishes an actual conflict that adversely affected counsel's performance, prejudice is presumed without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial."[34]

The Louisiana Supreme Court found that "[Chester] did not raise the issue pre-trial," and, as a result, concluded that he must present evidence that his counsels' "actual conflict" of interest "adversely affected his lawyer's [*sic*] performance" to be entitled to relief.[35] With respect to Chester's argument that his trial counsel's representation met both requirements, the Louisiana Supreme Court found "no merit to this contention."[36] It reasoned,

> Defendant contends that his court-appointed public defenders, Graham da Ponte and Cesar Vasquez, labored under a conflict of interest because their supervisor, Richie Thompson, represented Elbert Ratcliff, his co-defendant. He argues that the decision of Mr. Thompson to appoint these persons as counsel, neither of whom had tried a case in Jefferson Parish and who were less skilled than he, implied that Mr. Thompson wished to increase the chances for Thompson's own client. He further argued that his counsel were inexperienced. . . .

---

[32] *Id.* at 798 (quoting *United States v. Alvarez*, 580 F.2d 1251, 1254 (5th Cir. 1978)).

[33] *Id.* (citing *Strickland*, 466 U.S. at 688).

[34] *Id.* at 781–82 (citing *Strickland*, 466 U.S. at 692; *Cuyler*, 446 U.S. at 349; *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995) (en banc)); *see also Perillo v. Johnson*, 79 F.3d 441, 448 (5th Cir. 1996) ("While *Strickland* requires a showing of actual prejudice, that is, that the result of the trial probably would have been different, *Cuyler* merely requires that the petitioner show 'adverse effect,' a lower threshold. To prove adverse effect, a petitioner need not show that the conflict changed the outcome of the trial." (citing *United States v. Greig*, 967 F.2d 1018, 1024 (5th Cir. 1992), *Nealy*, 782 F.2d at 1365); *Mitchell v. Maggio*, 679 F.2d 77, 79 (5th Cir. 1982) ("Once it has been established that an actual conflict exists, prejudice to the defendant must be presumed.")); *Nealy v. Cabana*, 782 F.2d 1362, 1365 (5th Cir. 1986) ("Adverse effect is not the equivalent of prejudice, the reasonable probability of a different result, as the term "prejudice" is defined in *Strickland*." (citing *Strickland*, 466 U.S. at 692)).

[35] *Chester I*, Unpublished Appendix, at I.

[36] *Id.*

> Although defendant and Ratcliff had antagonistic defenses, they were not tried together, thus eliminating an actual conflict of interest and any chance of prejudice. A review of the record shows that Ms. Da Ponte had over ten years['] experience with mostly criminal cases and Mr. Vasquez had between five and ten years['] experience."[37]

The Louisiana Supreme Court's factual findings are not clearly erroneous. In his petition before this Court, Chester has not offered sufficient allegations that his trial counsel labored under an "actual conflict."[38] He offers no evidence Thompson had any involvement in Chester's representation, beyond the fact that Chester's attorneys were supervised by Thompson.[39] Moreover, in his petition to this Court, Chester's arguments focus primarily on his contention that the IDB is "a 'firm,' imputing each IDB attorney's conflict of interest to all IDB attorneys."[40] Essentially, Chester argues that, because Thompson had a conflict, and da Ponte and Vasquez were in the same "firm" as Thompson, da Ponte and Vasquez could not represent him. As previously stated, although such a claim might make out a violation of Louisiana's Rules of Professional Conduct,[41]

---

[37] *Id.*

[38] Therefore, the Court finds Chester is not entitled to an evidentiary hearing with respect to this claim. *See* 28 U.S.C. § 2254(e)(2) (allowing a federal district court to hold an evidentiary hearing if: (1) the petition's factual allegations, if true, would entitle the petitioner to relief; and (2) for reasons beyond the petitioner's control, the factual claims were not previously the subject of a full and fair hearing in the state court).

[39] *See Reynolds v. Chapman*, 253 F.3d 1337, 1345 (11th Cir. 2001) ("The ultimate fact is that Reynolds cannot identify any flaw in Hankins's performance that was related to the fact that Hankins's co-workers represented [his co-defendants,] Harris and Thomas."); *see also Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (explaining that "an actual conflict of interest" means "precisely a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties"); *Nealy*, 782 F.2d at 1366 ("The lawyer who represented both [defendants] was torn in his loyalty and unable to make a decision purely in the interest of one client to whom he owed undivided allegiance.").

[40] R. Doc. 1 at 62.

[41] *See* Louisiana Rules of Professional Conduct 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm."); *see cf. Cuyler*, 446 U.S. at 348 ("Holloway reaffirmed that multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest." (citing *Holloway*, 435 U.S. at 482)).

the ethical rules "are not determinative with respect to whether there is an actual conflict for Sixth Amendment purposes."[42]

The Louisiana Supreme Court's discussion in *State v. Garcia* of what constitutes an "actual" conflict is instructive.[43] In *Garcia*, three capital defendants were all represented by the same indigent defender board, and the attorneys were supervised by the same public defender, Jerome D'Aquila, who also served as lead counsel for the defendant, Garcia.[44] The Louisiana Supreme Court found there was no conflict of interest, reasoning that,

> there was no actual conflict in the attorneys' representation of defendant at trial because none of these attorneys' loyalties were divided. None of his attorneys jointly represented other defendants to whom the attorneys owed duties of loyalty. None of defendant's counsel was called upon to cross-examine any of his former or current clients in the State's prosecution, mandating reversal. Nor were any of defendant's attorneys called upon to take some action, or prevented from taking some action, based on a loyalty to another. Defendant was tried separately from his co-defendants.[45]

The factual underpinnings of this case are strikingly similar. Although Chester's trial counsel were members of the same IDB board as Ratcliffs' counsel and were supervised by Ratcliff's counsel, there is no evidence suggesting Chester's counsel collaborated with Ratcliff's counsel in any way, that Chester's counsel owed any loyalties to Ratcliff, or that Thompson exercised any influence or control over Chester's defense.[46]

---

[42] *Perillo*, 205 F.3d at 798 (citing *Strickland*, 466 U.S. at 688).

[43] *State v. Garcia*, 09-1578 (La. 11/16/12), 108 So. 3d 1.

[44] *Id.* at 13, 33–34.

[45] *Id.* at 33.

[46] In the Court's estimation, as discussed in greater detail *infra* notes 262–358, the evidence Chester offers of an actual conflict—that his trial counsel did not investigate the DNA sample found on Chester's cap and did not interview potential eye-witnesses that, had they been interviewed, would have implicated Ratcliff—evinces counsel's general ineffectiveness, not an effort to protect Ratcliff. For an example of a case finding an actual conflict existed, see *Glasser v. United States*, 315 U.S. 60, 72–75 (1942) (finding defense counsel's failure to cross-examine a prosecution witness whose testimony linked the defendant with the crime and failure to resist the presentation of arguably inadmissible evidence "resulted from" counsel's desire to diminish the jury's perception of a codefendant's guilt, and stating the evidence of counsel's "struggle to serve two masters [could not] seriously be doubted"). The Court notes, however, that the standard for

In light of the fact that Chester did not raise this issue until his case was on appeal, and the Louisiana Supreme Court's finding that his trial counsel's performance was not adversely affected by an actual conflict of interest, the Court finds this assertion of error lacks merit, as Chester has not offered clear and convincing evidence that such findings were incorrect.[47]

## II. Prosecutorial Misconduct

Chester next contends the prosecutors in his trial, Ronald Bodenheimer and Michael Reynolds, engaged in prosecutorial misconduct leading up to and during the trial. He argues the State violated: (1) *Brady v. Maryland*[48] by suppressing inconsistent statements made by the Pollard sisters;[49] (2) *Batson v. Kentucky*[50] for striking the only prospective black jurors from the jury venire;[51] (3) *Napue v. Illinois*[52] by "knowingly allowing" the Pollard sisters to testify falsely;[53] (4) *Arizona v. Youngblood*[54] by destroying potentially exculpatory evidence before the defense had the opportunity to inspect it;[55] and (5) *Donnelly v. DeChristoforo*[56] by making several misleading, prejudicial statements throughout trial.[57]

---

finding counsel's performance was "adversely affected" by an actual conflict of interest is a lesser burden than a finding of ineffective assistance. *See Perillo*, 205 F.3d at 781–82. Although the Court concludes counsel's performance was ineffective under the more stringent *Strickland* standard, it nevertheless denies the writ with respect to Chester's conflict of interest claim, as Chester has not shown that counsel's ineffectiveness was a product of an "actual conflict."

[47] *See* § 2254(e)(1).
[48] 383 U.S. 163 (1963).
[49] R. Doc. 1 at 67.
[50] 476 U.S. 79 (1986).
[51] R. Doc. 1 at 151.
[52] 360 U.S. 264 (1959).
[53] R. Doc. 1 at 82.
[54] 488 U.S. 51, 57 (1988).
[55] R. Doc. 1 at 98.
[56] 416 U.S. 637 (1974).
[57] R. Doc. 1 at 90.

## A. *Brady* Claim

On March 18, 1996, Kaprice Pollard called the police, complaining that her sister's boyfriend, Chester, refused to leave Kaprice's apartment at 1108 Newton Street. When police arrived, Kaprice told the officers her name was Keisha Gordon and that her sister Quinice's name was Latrisha Gordon. Police then arrested Chester after he jumped out of a bedroom window. Kaprice and Quinice, using the names Keisha and Latrisha, respectively, made statements to police that morning. Later, once police learned the sisters' true identities, they each made a second statement.

In her first statement, Kaprice told police that on the night of Adams' murder, she and Quinice were at 1108 Newton Street when Chester came to Kaprice's apartment. Kaprice claimed Chester came to the apartment at about 10:00 p.m. and told her and Quinice "him and Fellow had just, uh, killed a cab driver. [Chester] said he pulled the trigger and the man swung and hit the pole or something."[58] Kaprice also indicated Chester was wearing shorts and a black leather jacket.[59] She also told Sergeant Thornton that there was no blood on the jacket.[60]

Five hours later, Kaprice made a second statement. This time, she told police Chester arrived at her apartment at around three or four in the morning and that Chester and Quinice went into a bathroom.[61] She explained that, when Chester and Quinice went into the bathroom, she overheard Chester tell Quinice "he had just shot a cab driver over some dope."[62] This time, when Sergeant Thornton asked what Chester was wearing that

---

[58] R. Doc. 1-1 at 192–93.
[59] *Id.* at 194, 196.
[60] *Id.* at 196.
[61] R. Doc. 1-2 at 8–9.
[62] *Id.* at 6–14.

night, Kaprice said Chester had on "blue jeans" and that there was "definitely [blood] on his blue Girbaud pants."[63]

Quinice made a statement to police that same day. She said that the night of Adams' murder, Chester ran to his house on Jackson Street and that she did not see him until the next day at Flake's Store. She told the interviewing officer that, after she saw Chester at Flake's Store, she and Chester walked to his apartment on Jackson Street.

When the interviewing officer asked Quinice whether Kaprice was with her the first time she saw Chester following the murder, Quinice said:

> No. No. No. I was by my . . . it was just me and Teddy in the kitchen that night talking. Just me and Teddy. When I did . . . now wait, let me tell you how it went. When Teddy told me what happened across the track, I went and told Prisa. I said, well Prisa, I say uh . . . you know I said they saying Teddy got something to do with the cab driver over there. I said. Teddy said that he didn't have nothing. I said Teddy said that Fella the one pulled the trigger. I said he said that he just was there. Like that. That's all that was said.[64]

Sergeant Thornton then asked Quinice at what point she told Kaprice that Chester told her Ratcliff shot Adams, and Quinice stated:

> The . . . it was like the day after. That part was true. The day after I did tell her but he did not. . . . Only thing came up when I told her, I said Teddy said that Fella said . . . no. That Teddy . . . Teddy said that Fella killed the cab driver and that he know he gonna put him in it. I said he at the house scared now. I was over there by my sister house by myself that day. I said he over at the house scared now. So she said well you, do you think put . . . so she asked me, she said, do you think he did it. I said, no he said Fella did it.[65]

Two weeks before trial, Quinice changed her story and said that, when she saw Chester after the murder, he confessed to shooting Adams during an attempted robbery gone awry.[66]

[63] *Id.* at 10.
[64] R. Doc. 1-1 at 31.
[65] *Id.* at 31–32.
[66] *Chester I*, 724 So. 2d at 1281.

On May 17, 1996, defense counsel filed a motion for disclosure of evidence favorable to Chester pursuant to *Brady* and *Kyles*.[67] With respect to the Pollard sisters, the State filed a notice of possible *Brady* material, addressing the sisters' prior convictions and stating it would not object to an in camera review of the sisters' statements to police.[68] Following the trial court's review of the statements, the trial court provided defense counsel only with the portion of Quinice's statement in which she said Chester told her Ratcliff had shot Adams.

On May 17, 1996, defense counsel also filed a motion to "reveal the deal," including "any deals, implicit or explicit."[69] The State responded that there were no deals,[70] but did not disclose that it had declined to prosecute either Kaprice or Quinice for alleged criminal activities. Notably, Kaprice and Quinice explained in the second statements they to gave to police that they initially gave police officers false names because Quinice was on probation for possession of crack cocaine and Kaprice had a warrant out for her arrest based on a probation violation.[71]

Chester alleges that his trial counsel was unable to adequately cross-examine Kaprice and Quinice at trial because the only inconsistency of which trial counsel was aware was Quinice's prior statement that Chester told her Ratcliff shot Adams. Chester submits that "both individually and cumulatively, the State's failure to disclose all of the above impeachment evidence on the Pollard sisters was material under *Brady* and harmed the Petitioner's case."[72]

---

[67] R. 97–105. *See Brady*, 383 U.S. at 163; *Kyles v. Whitley*, 514 U.S. 419 (1995).
[68] R. 168.
[69] R. 87–89.
[70] R. 143.
[71] R. 1420, 1465–69.
[72] R. Doc. 1 at 82, 14.

The Louisiana Supreme Court held that Chester "fail[ed] to show that any suppression occurred as to the portion of Quinice's statement that would have been suitable for impeachment," noting that "the state disclosed the portion of Quinice's statement in which she initially told police [Chester] informed her that Ratcliff was the shooter." The court went on to state:

> Moreover, even assuming the state withheld the remainder of both sisters' initial statements, Chester fails to show it did so in violation of *Brady*. The only other inconsistencies he points to do not rise to a level capable of undermining the verdict because they pertain to the sisters' particular recollections about when and how they learned Chester was the shooter—*i.e.*, on the night of the crime or the next day—not to the material issue of *whether* they learned Chester was the shooter.[73]

To make a *Brady* claim, a habeas petitioner must prove: (1) that the "evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) that the "evidence [has] been suppressed by the State, either willfully or inadvertently"; and (3) that "prejudice [has] ensued."[74]

In *United States v. Bagley*,[75] the U.S. Supreme Court "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes,"[76] and held that "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"[77] Moreover, "a showing of materiality does not require demonstration by a

---

[73] *Chester II*, 208 So. 3d at 348.
[74] *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).
[75] 473 U.S. 667 (1985).
[76] *Kyles*, 514 U.S. at 433 (discussing *Bagley*, 473 U.S. at 682).
[77] *Bagley*, 473 U.S. at 682.

preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal."[78]

Even without the complete statements, trial counsel was able to impeach Quinice on her prior statement to police and was able to elicit testimony that called into question the veracity of her trial testimony:

> **Q**: Did Elbert Ratcliff ever threaten you to do harm?
> **A**: Yes. . . .
> **Q**: Did you also tell me that you had been threatened by the police if you did not cooperate?
> **A**: I told you that when we was in the room about being questioned, I was nervous and everything. I also told you that, the man, Detective Thornton told me if I can't get up and say what I said, he would "F" me. . . .
> **Q**: And, you also told me that—let me ask you: Did you also tell me that Detective Thornton told you that you had to tell what you said in Court?
> **A**: Yes ma'am.[79]

Although trial counsel's cross-examination of Quinice and Kaprice would likely have been more effective had she been able to point out other contradictions in their statements, the Louisiana Supreme Court's conclusion that Chester was not prejudiced by the State's failure to disclose this information is not an unreasonable application of *Brady*.

### B. *Batson* Claim

Chester argues the State acted in a discriminatory manner when it struck both of the only two prospective black jurors in the venire, and as a result, Chester was tried for a cross-racial crime before an all-white jury.[80]

---

[78] 514 U.S. at 434.

[79] R. 1424–27.

[80] Chester also argues that, because he is black and the victim was white, trial counsel's failure to conduct any questioning of the venire on racial prejudice was constitutionally deficient, pointing to *Turner v. Murray*, 476 U.S. 28 (1986) (holding that a capital defendant accused of a cross-racial crime has the right to question jurors on racial bias and inform them about the race of the victim). R. Doc. 1 at 151. Having offered no evidence of racial bias, the Court cannot agree, and finds this *Strickland* claim lacks merit.

"Discrimination in jury selection . . . causes harms to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process."[81] In *Batson*, the U.S. Supreme Court established a framework for determining whether peremptory strikes are racially motivated. Both the U.S. Supreme Court and the Fifth Circuit have granted writs of habeas corpus based on a finding that a state court made unreasonable factual determinations in rejecting a petitioner's *Batson* claim.[82] In those cases, the court relied heavily on a so-called "comparative juror analysis," wherein the reviewing court determines whether the reasons given by the prosecutor for striking black jurors apply equally to white jurors the prosecutor accepted.[83] Before a court undertakes such an analysis, however, the defendant must have first made a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race; in response, the prosecutor must have articulated a race-neutral reason for striking the juror in question.[84] "'[B]ecause a timely objection is an essential prerequisite to a *Batson* claim,' a defendant is not entitled to raise a *Batson* claim on appeal if he did not object to the prosecutor's use of peremptory challenges in the district court."[85] Thus, "a *Batson* challenge must be made timely or it will be rejected."[86]

During voir dire, defense counsel failed to object to the State's striking both of the two death-qualified African American prospective jurors.[87] As a result, the trial court did

---

[81] *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).
[82] *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005); *Reed v. Quarterman*, 555 F.3d 364, 382 (5th Cir. 2009).
[83] *See Reed*, 555 F.3d at 369.
[84] *Batson*, 476 U.S. at 96–98; *see Purkett v. Elem*, 514 U.S. 765, 768 (1995).
[85] *United States v. Flores*, 286 F. App'x 206, 210 (5th Cir. 2008) (quoting *United States v. Pofahl*, 990 F.2d 1456, 1465 (5th Cir. 1993)).
[86] *Garcia v. Excel Corp.*, 102 F.3d 758, 759 (5th Cir. 1997).
[87] The Louisiana Supreme Court's finding that Chester waived his *Batson* claim by failing to make a contemporaneous objection to the prosecutor's use of peremptories or to the composition of the jury is an independent and adequate state law ground for the judgment. *See Richardson v. Lemke*, 745 F.3d 258, 271–72 (7th Cir. 2014). Chester argues trial counsel's failure to object constitutes ineffective assistance and that, therefore, he has shown cause for the default. R. Doc. 1 at 151. With respect to this claim, the Louisiana

not have the opportunity to consider whether the State's use of peremptory strikes with respect to these two venire people was racially motivated. On Chester's direct appeal of his conviction, the Louisiana Supreme Court held that these alleged errors were without merit.[88]

A *Batson* claim presents a mixed question of law and fact, which "focuses on the reasonableness of the decisions of the state courts—that is, whether those decisions

Supreme Court held: "even assuming *arguendo* that counsel unreasonably failed to pursue this line of questioning, Chester fails to show entitlement to relief because he does not point to evidence that any juror harbored bias or was incapable of serving impartially." *Chester II*, 208 So. 3d at 346.

Because evaluating Chester's claim that his trial counsel's failure to raise a *Batson* claim requires the Court the evaluate the likelihood of success of Chester's hypothetical objection, "Petitioner has the burden of showing under *Strickland* (1) that counsel's failure to raise such an objection constituted deficient performance, and (2) a reasonable probability that such an objection would have been successful." *Mitcham v. Davis*, 103 F. Supp. 3d 1091, 1102 (N.D. Ca. 2015); *see also* 28 U.S.C. § 2254(d); *Wrinkles v. Buss*, 537 F.3d 804, 813 (7th Cir. 2008).

Courts have found counsel's failure to object to obvious racial discrimination during jury selection constitutes deficient performance under *Strickland*. *See, e.g., Eagle v. Linahan*, 279 F.3d 926, 938–43 (11th Cir. 2001) (petitioner's appellate counsel rendered ineffective assistance in not raising *Batson* claim on appeal); *Hollis v. Davis*, 941 F.2d 1471, 1476–79 (11th Cir. 1991) (petitioner's counsel's failure to object to systemic exclusion of African Americans from jury service constituted ineffective assistance establishing cause to overcome procedural default); *see cf Drain v. Woods*, 595 F. App'x 558, 582 (6th Cir. 2014) ("[D]efense counsel's failure to object to the manner in which the trial court dealt with the *Batson* violation did constitute deficient counsel."). To determine whether the need for an objection was obvious, courts have considered whether:

> (1) the prosecutor has struck most or all of the members of an identified group from the venire, or has used a disproportionate amount of his peremptory challenges against that group; (2) the prospective jurors in question have only their group identification in common, and in all other respects are as heterogeneous as the community as a whole (e.g., "in a case of alleged exclusion on the ground of race it may be significant if the persons challenged, although black, include both men and women and are of a variety of ages, occupations, and social or economic conditions"); (3) the prosecutor fails to engage the prospective jurors in more than desultory voir dire, or fails to ask them any questions at all; and (4) the defendant is a member of the excluded group, and if in addition, the alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.

*Mitcham*, 103 F. Supp. 3d at 1104. Chester has not offered any evidence in support of his argument that his trial counsel should have, but did not, object to the exclusion of two Black venire people from the jury, other than to simply state the State's striking of these prospective jurors was racially motivated. Moreover, Chester has not offered any evidence to suggest the Louisiana Supreme Court's factual determination—that no juror harbored bias or was incapable of serving impartially—was clearly erroneous. As a result, the Court finds this *Strickland* claim lacks merit.

[88] In its opposition, the State claims that, contrary to the state court's opinion, Chester did not raise this claim on direct appeal, and that, therefore, this claim has been procedurally defaulted. R. Doc. 27 at 104–05. Because the Louisiana Supreme Court proceeded to the merits of this claim, so too will this Court. *See Drain*, 595 F. App'x at 567 ("We choose not to raise the issue [of procedural default] *sua sponte*, and instead, we review the *Batson* claim and related ineffective assistance claim on the merits under AEDPA, as the state court of appeals *did* issue a decision regarding the merits of those claims.").

constituted an unreasonable application of Supreme Court precedent."[89] In addition, however, a *Batson* challenge regarding whether the prosecutor intended to discriminate impermissibly based on race is "a question of historical fact."[90] "Under AEDPA, primary or historical facts found by state courts are presumed correct and are rebuttable only by clear and convincing evidence."[91]

In his petition before this Court, Chester offers no more than the *ipse dixit* assertion that the State's striking of these prospective jurors was racially motivated. The Louisiana Supreme Court's finding that Chester waived his *Batson* claim by failing to make a contemporaneous objection to the prosecutor's use of peremptories or to the composition of the jury is an independent and adequate state law ground for the judgment. The Louisiana Supreme Court made factual findings that Chester's trial counsel failed to raise an objection pursuant to *Batson*, and that, in any event, the prosecutor did not act with prejudicial intent. These findings are not clearly erroneous and are entitled to deference.[92] Accordingly, the Court finds this claim lacks merit.

### C. *Napue* Claim

Chester argues the State violated *Napue* when the prosecution offered testimony from Quinice and Kaprice, arguing the prosecution knowingly elicited false testimony from both witnesses and failed to correct the sisters' false testimony.[93]

---

[89] *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

[90] *Id.* at 429.

[91] *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009) (internal quotation marks omitted); *see also Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. The trial court has a pivotal role in evaluating *Batson* claims." (internal citations omitted)).

[92] As the State points out, Chester does not "identify these two prospective jurors or give support to his claim that they were death qualified," and because trial counsel did not make a contemporaneous objection, "the proper *Batson* procedure was not complied with . . . . Thus, there was no *Batson* inquiry nor an offer of race-neutral reasons." R. Doc. 27 at 104.

[93] R. Doc. 1 at 82.

In *Napue*, the U.S. Supreme Court explained that if "false testimony used by the State in securing the conviction of [a] petitioner may have had an effect on the outcome of the trial," the petitioner's conviction must be reversed.[94]

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.[95]

In support of his *Napue* claim, Chester points to a sworn statement from Sheryl Nelson, in which Nelson states Quinice changed her testimony only because "prosecutors told her they would put her in jail and take away her child" if she did not.[96] Chester also points to the inconsistencies in both Quinice's and Kaprice's testimony. Chester argues these inconsistencies and Nelson's sworn statement make clear that either Kaprice or Quinice was lying, and that the State knowingly offered perjured testimony.

With respect to Nelson's sworn statement, the Louisiana Supreme Court, noting that a court must view "recantations 'with the utmost suspicion,'" held that "Nelson's statement does not rise even to the level of an actual recantation from Quinice but is rather merely a third party assertion that she has since claimed she gave false testimony."[97] The Louisiana Supreme Court was not persuaded that Quinince or Kaprice testified falsely and also was not persuaded that the State "knowingly" presented the allegedly perjured testimony. In his petition before this Court, Chester has not presented clear and convincing evidence that demonstrates (1) Quinice or Kaprice testified falsely,

---

[94] *Napue*, 360 U.S. at 272.
[95] *Id.* at 269–70.
[96] R. Doc. 1-2 at 16–19.
[97] *Chester II*, 208 So. 3d at 348.

and (2) that the State knew either one's testimony was false, but offered it anyway. The Court finds the Louisiana Supreme Court's holding is based on a reasonable determination of the facts.[98] As a result, the Court will not issue the writ on this basis.

### D. *Youngblood* Claim

Chester complains he was denied the ability to present a complete defense, including relevant evidence at trial, because (1) the State returned the cab to the King Cab Company about two days after the murder without first taking photographs of the back passenger-side seat or allowing the defense to inspect the cab,[99] and (2) the State's DNA testing consumed the entire blood sample found on Chester's cap before the defense could test it independently.[100]

The Due Process Clause requires that the State disclose to a criminal defendant "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed."[101] To safeguard that right, the Supreme Court has developed "'what might loosely be called the area of constitutionally guaranteed access to evidence.'"[102] As part of this guarantee, the State has a duty to preserve evidence known to be favorable to the accused. "Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt."[103]

A different standard applies to evidence that is only speculatively or potentially exculpatory, as opposed to clearly exculpatory evidence falling more directly under

---

[98] *See* 28 U.S.C. § 2254(d).
[99] Thomas Victory, the general manager of the King Cab Company, testified Adams' cab was released back to the cab company the day after the murder occurred R. 1363.
[100] R. Doc. 1 at 98.
[101] *California v. Trombetta*, 467 U.S. 479, 485 (1984).
[102] *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).
[103] *Trombetta*, 467 U.S. at 485.

*Brady.* "[T]he Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."[104] The State's duty to preserve this type of evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense."[105]

The U.S. Supreme Court held in *Youngblood*, "that unless a criminal defendant can show bad faith on the part of the [State], failure to preserve potentially useful evidence does not constitute a denial of due process of law."[106] Under these standards, the exculpatory value of the evidence must have been apparent "before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."[107] The mere fact that the State had control over evidence and failed to preserve it is insufficient, by itself, to establish bad faith, and bad faith will not be found in the State's negligent failure to preserve potentially exculpatory evidence.[108]

In this case, the Louisiana Supreme Court rejected Chester's claims under *Youngblood*, finding that they were speculative,[109] and therefore holding that "because

---

[104] *Youngblood*, 488 U.S. at 57 (emphasis added).
[105] *Trombetta*, 467 U.S. at 488.
[106] *Youngblood*, 488 U.S. at 58; *see Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004).
[107] *Trombetta*, 467 U.S. at 489; *Youngblood*, 488 U.S. at 56, n."*" ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."); *Allen v. Collins*, 987 F.2d 771, 1993 WL 67167, at *4 (5th Cir. Mar. 4, 1993).
[108] *See Youngblood*, 488 U.S. at 58 (finding the failure to refrigerate clothing or test semen samples was at worst negligence and not demonstrative of bad faith); *Malcum v. Burt*, 276 F. Supp. 2d 664, 683 (E.D. Mich. 2003) (citing *Lile v. McKune*, 45 F. Supp. 2d 1157, 1163 (D. Kan. 1999)); *Lions v. Baker*, No. 13-CV-321, 2016 WL 7191617, at *6 (D. Nev. Dec. 12, 2016) ("Even negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due process.").
[109] *Chester II*, 208 So. 3d at 349.

[Chester] does not show that the evidence was lost as a result of demonstrable bad faith by the state," relief was not warranted as to this claim.[110]

In his petition before this Court, Chester contends his "right to a fair trial was denied because the State did not fulfill its constitutional duty to preserve *potentially exculpatory evidence.*"[111] Chester does not allege that the State acted in bad faith, nor does he offer any evidence to that effect, when it consumed the entire DNA testing sample and returned the cab to King Cab the day after the murder.[112] Thus, the Court finds this claim lacks merit.[113]

### E. *Donnelly* Claim

Chester complains the State's arguments during both the guilt and punishment phases of his trial violated his right to due process as articulated in *Donnelly*.[114] In *Donnelly*, the U.S. Supreme Court held that, in some instances, a prosecutor's statements to the jury can be so egregious that they deprive the defendant of due process.[115] The petitioner in *Donnelly* was tried in Massachusetts State Court for first degree murder. During the course of his trial, one of the petitioner's co-defendants with whom he was being tried jointly elected to plead guilty to a lesser charge, and the trial judge advised the

---

[110] *Id.*

[111] R. Doc. 1 at 98 (emphasis added).

[112] In his petition, Chester repeatedly points out that, years after Chester's trial, the prosecutor in his case, Ronald Bodenheimer, was convicted of various federal charges resulting, in part, from an FBI probe called Operation Wrinkled Robe. Although Chester does not argue the crimes of which Bodenheimer was convicted affected Chester's trial or that his convictions are evidence of the State's "bad faith," Chester does note that "[i]t is either a striking coincidence, or a disturbing pattern of practice, that prosecutor Bodenheimer did the very same thing in another capital case during the same time period, where a shooting occurred in a Metry Cab and the State returned the cab to its owner without taking photographs of the exterior and before counsel was even appointed to represent the defendant." R. Doc. 1 at 98 n.27 (citing *Seals v. Vannoy*, No. 2:16-cv-09892-SSV-JCW (E.D. La.) (pending)).

[113] Chester also argues trial counsel's failure to object to the State's destruction of evidence amounts to ineffective assistance of counsel. *Id.* at 55. Having found no underlying *Youngblood* violation, Chester's ineffective assistance of counsel claim with respect to this issue necessarily fails.

[114] R. Doc. 1 at 90.

[115] 416 U.S. at 648.

jury that the petitioner's co-defendant had pleaded guilty. The petitioner's trial then continued.

In his closing argument, the prosecutor stated he "honestly and sincerely believe[d] that there is no doubt [the defendant is guilty] in this case, none whatsoever" and that "They," meaning the petitioner and his counsel, "said they hope that you find him not guilty. I quite frankly think that they hope that you find him guilty of something a little less than first-degree murder." The petitioner's counsel objected to the statements and later sought an instruction that the remark was improper and should be disregarded. The trial court instructed the jury that the prosecutor's statements were not evidence and told the jury to "[c]onsider the case as though no such statement[s] [were] made."[116]

The jury found the petitioner guilty of first degree murder, and his conviction was affirmed on appeal by the Massachusetts courts. The petitioner then sought habeas corpus relief in the U.S. District Court for the District of Massachusetts, which denied the writ. The First Circuit reversed.[117] The circuit court reasoned that the prosecutor's remarks, when combined with the guilty plea of the petitioner's co-defendant, would probably have conveyed to the jury a notion that the petitioner had also sought to enter guilty plea, but had been refused.[118] The circuit court explained that, because the prosecutor's statements created this impression, the petitioner was denied due process.[119]

The U.S. Supreme Court reversed.[120] The Court cautioned that, although "[t]he 'consistent and repeated misrepresentation' of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations,"

---

[116] *Id.* at 641.
[117] *DeChristoforo v. Donnelly*, 473 F.2d 1236 (1st Cir. 1973), *reversed by* 416 U.S. at 648.
[118] *Id.* at 1240–41.
[119] *Id.*
[120] 416 U.S. 637.

"[i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions."[121] The Court reasoned that, given that the district court and the court of appeals had differing opinions as to what conclusion the jury might have drawn from the prosecutor's statements, "it is by no means clear that the jury did engage in the hypothetical analysis suggested by the majority of the Court of Appeals, or even probable that it would seize such a comment out of context and attach this particular meaning to it."[122] Ultimately, because the trial court properly instructed the jury to disregard the prosecutor's statements and it was not clear what inference the jury might have made as a result of the comments, the Court found the prosecutor's comments did not render the petitioner's "trial so fundamentally unfair as to deny him due process."[123]

### 1. Defaulted claims

During the guilt phase of trial, Chester's trial counsel failed to object to the statements about which Chester now complains. With respect to these unobjected to statements, the Louisiana Supreme Court held Chester's claims of error were procedurally defaulted:

> He argues that [during the guilt phase of trial] the prosecutor misstated the law of principals and gave incorrect definitions of reasonable doubt, he expressed his personal opinion regarding defendant's guilt and the facts of the case, he bolstered the testimony of Kaprice Pollard and his own position in the criminal justice system, he misstated the law and evidence in several instances throughout trial, and he thanked the jury "on behalf of the people of Jefferson and the family of John Adams" during his closing statement. Defendant failed to object to these comments of the prosecutor during trial or closing arguments. Any claim of error based on prosecutorial misconduct in the guilt phase not objected to was therefore waived.[124]

---

[121] *Id.* at 646.

[122] *Id.* at 643.

[123] *Id.* at 645.

[124] *Chester I*, Unpublished Appendix, at XV, XVI (citing LA. CODE CRIM. P. art. 841; *State v. Taylor*, 93-2201 (La. 2/28/1996), 669 So. 2d 364, 369). For example, Chester complains the State told the jury the blood

When a state court invokes a procedural rule to deny a prisoner's claims, a federal habeas court is precluded from reviewing the claims if "the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed."[125] This doctrine is not without exceptions, however. "A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law."[126] Ineffective assistance of counsel may qualify as cause for the default.[127]

Chester contends he can overcome this procedural bar to federal habeas review, as his trial counsel's failure to object to these statements constitutes ineffective assistance. Even assuming defense counsel's failure to object rendered her performance constitutionally deficient, however, Chester has not shown he was prejudiced by the statements.[128] Thus, finding no exception to the general rule that a federal habeas court

---

evidence "matched" John Adams' DNA. According to Chester, this mischaracterized and overstated the DNA evidence. R. Doc. 1 at 84. Chester also points to the prosecutor's closing statements during the guilt phase of trial, during which he thanked the jury "on behalf of the people of Jefferson and the family of John Adams." Chester also complains that the prosecution repeatedly and improperly defined reasonable doubt as "not 100 percent," as "not to a scientific certainty," and as a doubt that "you can give a reason for," and by stating: "I think defense counsel and [I] agree [that] when you're satisfied that it occurred and you're a reasonable person, that's proof beyond a reasonable doubt." R. at 1102–05; 1206–07. Finally, Chester points to the prosecutor's closing argument in the guilt phase of trial, during which the prosecutor allegedly misstated the law of principals, R. Doc. 1 at 92, when he explained to the jury:

> But even when [Quinice Pollard] was trying to help the guy she was in love with [Teddy Chester], her old man, even when she was in love with him she said, "He told me they were robbing the cab driver and Fellow killed him." That makes him a principal to first degree murder right there. I'm sure she doesn't know the law, but that made him a principal right then and there.

R. at 1634–35. Defense counsel failed to object to any of these statements.

[125] *Martinez v. Ryan*, 566 U.S. 1, 11 (2012) ("Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule.").

[126] *Id.*

[127] *Id.*

[128] *See Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012).

is barred from considering claims defaulted in state court applies in this case, the Court does not consider these claims.[129]

## 2. Statements Made During the Penalty Phase

Chester contends the State "made a number of improper statements on closing argument of the penalty phase that deprived Mr. Chester's sentencing determination of the reliability that the Sixth, Eighth, and Fourteenth Amendment[s] require[]."[130] First, Chester contends the State mischaracterized Professor Dean Burk Foster's testimony. Second, Chester argues the State misstated the law of mitigation. Third, Chester submits prosecutor Bodenheimer improperly "interjected his own personal beliefs into the case and resorted to personal experience."[131] Because Chester argues these statements, when taken as a whole, deprived him of his right to due process, the Court analyzes them together.

### a. Professor Foster

During the penalty phase, the defense called Professor Foster to discuss conditions at Angola, the prison where an adult male sentenced to life in prison in Louisiana would more than likely serve his time.[132] During the State's cross-examination of Professor Foster, the State asked Professor Foster about "institutionalization" in the criminological context. Professor Foster explained that it meant "[an inmate] adapt[s] to the conditions of an institution to the point that [he] become[s] so affixed to the routine that it's difficult for [him] to function outside of prison."[133] The State then asked Professor Foster to "describe the conditions at Angola and the conveniences at Angola compared to, let's say

---

[129] *See Trevino v. Thaler*, 569 U.S. 413, 421 (2013).
[130] R. Doc. 1 at 183.
[131] R. Doc. 1 at 184.
[132] R. 1775–98.
[133] R. 1791.

troops in Dessert Storm,"[134] adding "[is there] [a]nybody in Angola living in tents?" Professor Foster responded that, in fact, some inmates had been housed in tents, but that "[the inmates] don't ordinarily live in tents, no."[135]

In his closing argument to the jury, the prosecutor, referring to Professor Foster, stated Chester's "own expert talked to you about institutionalization. And that happens every day at Angola. It's people who become so happy, so content with their surroundings, they don't even want to leave prison."[136]

### b. Law of Mitigation

At the penalty phase, defense counsel offered evidence of Chester's difficult upbringing and evidence of his learning disabilities, including that Chester is dyslexic.

During closing arguments, the prosecutor stated Chester's "dyslexia and abuse . . . [has] got nothing to do with all of this. It's got nothing. You know what this has got to do with, two things: does he know right from wrong? And everybody said yes, he knows right from wrong. And the second is your choice. You make your choices as you live."[137]

### c. Interjection of Personal Beliefs

During rebuttal the prosecutor stated,

> So we don't say 'an eye for an eye and a tooth for a tooth' in all cases, but in this one, I say yes. And some people say, 'Well then, you've got a society of people who are both blind and toothless.' And I say, 'If you don't, you're going to have a society where victims are blind and toothless and murders can see and chew.' That's the alternative. Our victims are going to be slaughtered in the street, but were going to give life to their killers. That, to me, make no sense whatsoever.[138]

Shortly after that, he added:

---

[134] R. 1791.
[135] *Id.*
[136] R. 1861.
[137] R. 1862.
[138] R. 1859–60.

And I know, because I have a mother, you know—she's dead now, but she used to complain that I didn't call her every day. . . . But John Adams did. I hate to say it, but he was a better son than I was, because I couldn't get to my mother every day. You know, I just got busy. But, you know, every day he called his mom. He was a giver.[139]

The prosecution also challenged the defense "to answer to [the juror's] satisfaction": "What good it's going to do society to give him, to award him [with] life in prison?"[140] On rebuttal, the prosecutor then argued the death penalty is "the only way you can be 100 percent sure that Chester never kills again,"[141] adding that the death penalty will only be a deterrent once "the jurors stand up and start enforcing the laws,"[142] by "cut[ting] off the cancer to save society."[143]

### 3. Analysis

Chester claims all of the prosecutor's statements during the penalty phase, taken as a whole, deprived him of his right to a fair trial, pointing to *Berger v. United States*.[144] In *Berger*, the U.S. Supreme Court stated "improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."[145]

On the direct appeal of his conviction, the Louisiana Supreme Court concluded that the prosecutor's statements were improper, but nevertheless held they did not prejudice Chester.[146] The Louisiana Supreme Court explained:

We do not find these remarks were of such a nature as to require a mistrial nor did they exceed the scope of proper closing argument. The state is permitted to argue why the death penalty is appropriate for a defendant and for the crime. [With respect to the prosecutor's statements regarding Dr.

---

[139] R. 1864.
[140] R. 1843.
[141] R. 1864.
[142] R. 1861.
[143] R. 1859.
[144] R. Doc. 1 at 182–85 (citing 295 U.S. 78 (1935)).
[145] 295 U.S. at 88.
[146] *Chester I*, Unpublished Appendix, at XXX, XXIX.

Foster's testimony,] [we] find that the misstatements were not so prejudicial, and in any event, the trial judge properly instructed the jury on the law of mitigation.

The defense claims prosecutorial misconduct when the prosecutor referred to facts not in evidence when he declared that "Teddy Chester has escaped responsibility his whole life." We consider this to be a comment on defendant's life style based upon witnesses' testimony at trial and as such is not a reiteration of a fact. Defendant further complains that the prosecutor interjected his own personal beliefs into rebuttal when he stated, "And I know, because I have a mother, you know—she's dead now, but she used to complain that I didn't call her every day. But John Adams did. I hate to say it, but he was a better son that I was, because I couldn't get to my mother every day." We find that the remark was within the considerable latitude allowed prosecutors in closing argument, and, in any event, we do not think the jury was ever in doubt that the ultimate decision was theirs and that the prosecutor was only arguing the state's position. . . . These assignments of error are without merit.[147]

Chester argues the Louisiana Supreme Court's finding was an "unreasonable factual determination, as it understates the influence a prosecutor has on a jury—particularly when he has just persuaded them to find a man guilty—and the potential for that influence to sway their decision on impermissible grounds."[148] However, the Court agrees with the Louisiana Supreme Court that the prosecutor's statements did not render Chester's "trial so fundamentally unfair as to deny him due process."[149] As a result, this Court is not persuaded that the Louisiana Supreme Court's holding was: (1) contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the U.S. Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[150]

---

[147] *Chester I*, Unpublished Appendix, at XXIX, XXX.
[148] R. Doc. 1 at 185.
[149] *Donnelly*, 416 U.S. at 645.
[150] *See* 28 U.S.C. § 2254(d).

### III.    *Atkins* Claim

Chester next contends that his death sentence violates *Atkins v. Virginia*,[151] claiming that he is intellectually disabled and the Louisiana Supreme Court's finding to the contrary is not entitled to the presumption of correctness.[152]

The Court first addresses Chester's contention that his *Atkins* claim should be viewed through the lens of *Roper v. Simmons*,[153] a case in which the U.S. Supreme Court held the execution of a person who committed his or her crime as a minor violates the Eighth and Fourteenth Amendments, as Chester's crime took place only forty-seven days after his eighteenth birthday. The U.S. Supreme Court's holding in *Roper* was clear: "The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were *under the age of 18* when their crimes were committed."[154] Thus, *Roper* plainly does not "govern" Chester's case, and his *Atkins* claim cannot be viewed through that lens.

In *Atkins*, the U.S. Supreme Court held that executing an intellectually disabled person violates the Eighth Amendment's prohibition on cruel and unusual punishment.[155] The Court relied heavily on current medical standards,[156] which indicate individuals with an intelligence quotient ("IQ") of approximately seventy or below are considered intellectually disabled.[157] Later, in *Hall v. Florida*, the U.S. Supreme Court evaluated a Florida statute that created a bright line rule making anyone whose IQ was above seventy eligible for execution.[158] In *Hall*, the Court held that Florida's bright line rule made the

---

[151] 536 U.S. 304 (2002).
[152] R. Doc. 1 at 103–08, 119.
[153] 543 U.S. 551 (2005).
[154] *Id.* at 578.
[155] 536 U.S. at 321.
[156] *Id.* at 308 n.3.
[157] *Id.*
[158] 134 S. Ct. 1986, 1994–95 (2014).

possibility that an intellectually disabled person would be executed too great, explaining that IQ scores constitute only a part of what should be considered in determining whether a person has deficient general intellectual functions.[159]

The Supreme Court's holding in *Atkins*, issued in June of 2002, applies retroactively.[160] Chester, having been sentenced to death in 1997, sought to overturn his death sentence on the basis of his alleged intellectual disability. Pursuant to this assertion, the Louisiana district court held an extensive post-conviction *Atkins* hearing on November 12–15, 2013.[161]

On December 10, 2013, the state district court denied Chester's *Atkins* claim, explaining:

> Petitioner fails to meet his burden of proving he is mentally retarded by [a] preponderance of evidence. Petitioner did not submit sufficient evidence to meet this burden. Moreover, the State presented ample evidence that Petitioner is not mentally retarded. The court has had the opportunity to observe Petitioner in court on several occasions, and is impressed with petitioner's intellectual abilities to discuss complicated legal issues with an obvious degree of understanding. Petitioner has also filed numerous pleadings and has a strong grasp of the law in areas at issue.[162]

On review, the Louisiana Supreme Court found Chester's *Atkins* claim was procedurally barred, as Chester "failed to timely seek review of the District Court's

---

[159] *See id.* at 1995 (providing that a person's IQ score may fluctuate on any given day based on factors such as health and location of test administration).

[160] "[T]he Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Atkins*, 536 U.S. at 321 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)); *see Penry v. Lynaugh*, 492 U.S. 302, 330 (1989) ("[I]f we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons . . . regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review."); *see also Tyler v. Cain*, 533 U.S. 656, 668 (2001) (O'Connor, J., concurring).

[161] *See* Appendix I *infra* (Volume 24, Petitioner Exhibit 33, on Writ Application to the Louisiana Supreme Court).

[162] *Id.*

December 5, 2013, ruling dismissing it."[163] Chester contends the state court "erroneously applied an inapplicable and inadequate state procedural bar," noting that on November 21, 2013, Chester's post-conviction counsel filed a "Notice of Intent to Seek Writ of Review."[164] Even assuming Chester has not procedurally defaulted this claim, however, the Court concludes Chester has failed to demonstrate the Louisiana district court's determination that he is not intellectually disabled was: (1) contrary to, or involved an unreasonable application of, *Atkins*; or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[165] Thus, the Court will not grant the writ based on this claim.

## IV.    Trial Court's Alleged Errors

Chester alleges the trial court made several errors that deprived him of his right to a fair trial. The Court notes at the outset that "federal habeas corpus relief does not lie for errors of state law,"[166] including whether "evidence was 'incorrectly admitted . . . pursuant to [Louisiana] law.'"[167] Thus, a federal habeas court may grant a writ of habeas corpus only if the petitioner demonstrates the state court's errors "violated the Constitution, laws, or treaties of the United States."[168]

---

[163] *Chester II*, 208 So. 3d at 351–52.

[164] R. Doc. 1 at 107; R. Doc. 1-4 at 29.

[165] *See* 28 U.S.C. § 2254(d). Chester also contends trial counsel's failure to subject Chester to additional neuropsychological testing constituted ineffective assistance of counsel. Even assuming trial counsel's failure to do so rendered her performance constitutionally deficient, Chester was not prejudiced by the error. *See Strickland*, 466 U.S. at 687.

[166] *Lewis v. Jeffers*, 497 U.S. 780 (1990); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984).

[167] *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *see also Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) ("Errors of state law, including evidentiary errors, are not cognizable in habeas corpus."); *Porter v. Estelle*, 709 F.2d 944, 957 (5th Cir. 1983) ("We have repeatedly admonished that we do not sit as a super state supreme court on a habeas corpus proceeding to review error under state law.") (quoting *Mendiola v. Estelle*, 635 F.2d 487, 491 (5th Cir. 1981)).

[168] *McGuire*, 502 U.S. at 67. In addition to the claims discussed *infra*, Chester also alleges the trial court violated his constitutional rights when the court: (1) admitted only portions of letters Chester sent to Quinice, R. Doc. 1 at 144; (2) denied defense counsel's attempt to impeach the Pollard sisters based on their prior juvenile convictions, *id.* at 167; (3) restricted testimony during the punishment phase of trial, *id.* at 173; (4) admitted testimony from Rahn Bailey, *id.* at 176; (5) failed to admonish prospective jurors before

## A. Bill of particulars amended the morning of trial

Chester and Ratcliff were indicted by a Jefferson Parish, Louisiana grand jury on

April 25, 1996 for the murder of John Adams.[169] The indictment stated:

> The Grand Jurors of the State of Louisiana, duly empaneled and sworn, in and for the body of the Parish if JEFFERSON, in the name and by the authority of the said State, upon their Oath, present: That one
>
> TEDDY CHESTER, n/m 11/10/77
> ELBERT RATCLIFF, n/m 9/30/70
>
> late of the Parish of JEFFERSON, on or about the 27th day of December in the year of our Lord, One Thousand Nine Hundred and Ninety-Five (1995) with force and arms, in the Parish of JEFFERSON aforesaid, and within the jurisdiction of the Twenty-Fourth Judicial District Court of Louisiana, in and for the Parish of JEFFERSON aforesaid, then and there being violated R.S. 14:30 in that they did commit first degree murder of John Adams, contrary to the form of the Statute of the State of Louisiana, in such case made and provided, and against the peace and dignity of the State.[170]

On May 17, 1996, the defense filed a bill of particulars,[171] asking:

> If this prosecution is based on LSA R.S. 14:30(6), specify the controlled substance involved in the transaction, the schedule under which is it [sic] classified, whether the victim was distributing or purchasing the controlled

---

releasing them, *id.* at 152; (6) required Chester to wear shackles throughout the trial, *id.* at 164; (7) admitted Chester's custodial statements, *id.* at 121; (8) admitted "prejudicial" photographs of the victim, *id.* at 170; (9) admitted evidence of Adams' personal characteristics, *id.* at 174; (10) allowed the prosecution to discuss Ratcliff's custodial statements, *id.* at 168; and (11) prevented Chester from demonstrating Kaprice Pollard's bias on cross-examination, *id.* at 166. The Court, after reviewing the pleadings, Louisiana Supreme Court's holdings on these claims, and the applicable law, finds these claims do not warrant habeas relief.

[169] R. 43.

[170] *Id.*

[171] A bill of particulars is "[a] formal, detailed statement of the claims or charges brought by a plaintiff or a prosecutor, usu[ally] filed in response to the defendant's request for a more specific complaint." *Bill of Particulars*, BLACK'S LAW DICTIONARY (10th ed. 2014). "The bill of particulars has been abolished in federal civil actions and replaced by the motion for a more definite statement." *Id.* (citing FED. R. CIV. P. 12(e)). In Louisiana,

> A motion for a bill of particulars may be filed of right in accordance with Article 521. The court, on its own motion or on motion of the defendant, may require the district attorney to furnish a bill of particulars setting forth more specifically the nature and cause of the charge against the defendant. Supplemental bills of particulars or a new bill may be ordered by the court at least seven days before the trial begins. When a bill of particulars is furnished, it shall be filed of record and a copy of the bill shall be given to the defendant.

LA. CODE CRIM. P. 484.

dangerous substance and whether the offender was distributing or purchasing the controlled dangerous substance.[172]

The defense asked a similar question on the same date with respect to the penalty phase of trial.[173] On September 10, 1996, the prosecution responded to the question, stating with respect to the guilt phase of trial: "Cocaine; 40:967(c). The offender was attempting to rob the victim."[174] With respect to the penalty phase, on January 31, 1997, the prosecution stated: "The defendant was attempting to acquire cocaine, a violation of R.S. 40:967(c)."[175] According to defense counsel, she interpreted these responses to mean the State alleged Chester had murdered Adams after Chester tried to rob Adams of cocaine.[176]

On the morning of trial, May 6, 1997, the prosecution filed a supplemental bill of particulars for first degree murder, adding another aggregating factor: "While engaged in the attempted distribution, exchange, or sale of a controlled dangerous substance listed in the uniform controlled dangerous substance law, and/or during the course of armed robbery."[177] The trial court allowed the amendment, over defense counsel's objection.[178]

Chester claims this amendment violated the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as his "right to notice was violated when the prosecution changed the aggravating circumstance it was alleging on the morning of trial."[179] According to Chester, "This case featured a bait and switch of statutory elements

---

[172] R. 54–55.
[173] R. 72–73.
[174] R. 114.
[175] R. 137–38.
[176] R. Doc. 1 at 163.
[177] R. 206.
[178] R. 440–45, 563.
[179] R. Doc. 1 at 161–63.

where Mr. Chester prepared to defend against a robbery of cocaine, only to find on the morning of trial that he needed to actually prepare a defense for a drug sale."[180]

In opposition, the State submits this issue is moot, as the jury ultimately rejected the State's argument that Chester committed the murder while attempting to sell cocaine. Rather, the jury found the aggravating circumstance that made Chester "death-eligible" was that Chester "committed the murder during an attempted armed robbery," the aggravating factor the State listed in its original bill of particulars.[181] The State argues that its initial response to Chester's request for a bill of particulars—that Chester "was attempting to rob the victim"[182]—in addition to Chester's prior statements to the police, in which he admits to attempting to sell Adams "bunk," but alleges Ratcliff attempted to rob Adams, provided Chester with sufficient notice that he would need to defend against the allegation that he committed the murder during the commission of a robbery.[183]

The Louisiana Supreme Court agreed with the State and found Chester was not prejudiced by this amended response because Chester's counsel was aware of the accusation that Chester had committed the murder during the commission of a robbery.[184] In his petition to this Court, Chester does not argue he was prejudiced by the State's amendment to the bill of particulars, other than to state that "the prejudice in lack of notice is readily apparent."[185]

Although amending the bill of information the morning of trial is far from best practice, the Court's "distaste for the government's conduct does not . . . warrant a

---

[180] *Id.* at 163.
[181] *Chester*, 724 So. 2d at 1281.
[182] R. 114.
[183] R. Doc. 27 at 119.
[184] *Chester I*, Unpublished Appendix, at II, III.
[185] R. Doc. 1 at 163.

reversal," as "an error in administering the discovery rules is not reversible absent a showing that the error was prejudicial to the substantial rights of the defendant."[186] The Court finds no error in the Louisiana Supreme Court's conclusion that Chester was not prejudiced by the State's amendment to the bill of information the morning of trial, and as a result, the Court concludes the Louisiana Supreme Court's holding with respect to this claim was not (1) contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the U.S. Supreme Court, nor was it (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[187]

## B. Trial Court's Statements During Voir Dire

Chester next complains he was prejudiced by the trial court's statements to the jury during voir dire. Specifically, Chester alleges he was prejudiced when the trial court judge told the initial nine jurors selected that they would be sequestered and informed them of the location of their sequestration, adding:

> All right. If you want to make a phone call, just let somebody know what's going on, that that's where you'll be staying. Ask them not to repeat that to anybody. We don't, we don't want the Press or anybody to know where you're staying, or the defendant. It's just better for you just to have some privacy; okay?[188]

Chester contends this statement and an instruction to the prospective jurors that they not disclose their addresses in open court "were indisputably reversible error," as the statements demonstrate Chester did not receive the "full protection of the presumption

---

[186] *United States v. Barrentine*, 591 F.2d 1069, 1077 (5th Cir. 1979) (quoting *United States v. James*, 495 F.2d 434 (5th Cir. 1974)) (affirming the defendants' conviction, even though the prosecution failed to disclose a government witness in compliance with the court's order granting the defendants' motion for a bill of particulars identifying any alleged co-conspirators who had not been indicted because "from the beginning appellants suspected that Bland was the government's informer").
[187] *See* 28 U.S.C. § 2254(d).
[188] R. 1188.

of innocence."[189] On direct appeal, the Louisiana Supreme Court found this claim lacked merit, finding that the trial court's statements, when viewed "in the context of the entire colloquy," made clear that the trial court did not single Chester out in the jury's presence or infer that she did not want Chester to know where the jurors were staying because he was dangerous. Rather "the trial judge explained that the reason for secrecy was for the jurors' privacy and to avoid communication with people in general, the press, the jurors' families as well as [Chester]."[190] The Court agrees with the Louisiana Supreme Court that this claim lacks merit.

### C.  Jury Selection

Chester next contends the Louisiana trial court deprived him of his right to be tried by a fair and impartial jury when it allowed Leslie Dawson to serve on the jury.[191] Citing to *Ross v. Oklahoma*,[192] Chester argues Dawson's presence on the jury violated his Sixth and Eighth Amendment rights.

"[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case."[193] In *Wainwright v. Witt*, the U.S. Supreme Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the

---

[189] R. Doc. 1 at 139–40.
[190] *Chester I*, 724 So. 2d at 1283–84.
[191] R. Doc. 1 at 160.
[192] 487 U.S. 81 (1988); *see also Morgan v. Illinois*, 504 U.S. 719 (1992); *Witherspoon v. Illinois*, 391 U.S. 510 (1968).
[193] *Lockhart v. McCree*, 476 U.S. 162, 184 (1986).

performance of his duties as a juror in accordance with his instructions and his oath.'"[194] To serve on a capital jury, a person must be willing to consider all potential sentencing options, in this case both death and life imprisonment.[195] If the prospective juror's opinions would prevent her from considering any sentencing option, then she must be stricken for cause.[196]

During jury selection, both parties questioned the members of the venire about their positions on the death penalty. Dawson was asked what her position on the death penalty was, to which she responded:

> Well, I believe if someone premeditated, it's a premeditated situation, that I don't feel why should they have even life imprisonment? If they take somebody else's life and this was thought about beforehand, if they're going to do this act why should they get the opportunity to life[?]"[197]

Thereafter, the following exchange took place:

> **Q**: So if the State of Louisiana proves a murder with specific intent, that they say—as we say—premeditated is not the word in Louisiana—but premeditated, would you—you're saying you would never be able to consider life imprisonment for that?
> **A**: I wouldn't say never.
> **Q**: Okay. What sort of information would you have to hear, what sort of evidence would you have to hear to be able to consider life imprisonment?
> **A**: Well, it's kind of hard to answer that, to pinpoint one specific thing. I mean I think there's two sides to every story, so I'd have to know all the facts before I could do it, of course. But I do believe in it.
> **Q**: Do you subscribe to the theory, "An eye for an eye, a tooth for a tooth"?
> **A**: Pretty much. . . . Well, I mean there's always going to be some circumstances that will, you know, make me say differently, but I do believe in it.
> **Q**: But you can't think of any of those circumstances?
> **A**: When you were asking the other gentlemen about the age [whether the defendant's youth would be a factor], you know, I don't feel like that's a

---

[194] 469 U.S. 412, 424 (1985).
[195] *Lockhart*, 476 U.S. at 176–77; *Uttecht v. Brown*, 551 U.S. 1, 8 (2007); *see also Gray v. Mississippi*, 481 U.S. 648 (1987).
[196] *Lockhart*, 476 U.S. at 176–77.
[197] R. 609.

factor. I feel like if you're performing an adult crime, murder, then you need to pay the price. . . .

**Q**: What about the fact that the defendant was raised in an abusive alcoholic environment, would that make a difference?

**A**: I don't know. Because to me that's like putting the blame on someone else, "This poor person, because of what they were up against." I just think back of years ago, I mean I think everything now is out of whack. I mean years ago when our parents were coming up and brought up in the Depression, they didn't go around killing people like they do today. That's just something you didn't do. And now everything's acceptable.[198]

Defense counsel then moved to strike Dawson for cause, which the Court denied.[199]

Chester raised this issue in his direct appeal to the Louisiana Supreme Court. The court found no error in the trial court's ruling, noting "Ms. Dawson did not rule out the consideration of a life sentence."[200]

A trial court's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the 'factual issues' that are subject to § 2254(d)."[201] Although Dawson was not able to articulate the specific mitigating evidence that would sway her in favor of a life sentence rather than one of death, she at no point indicated she would be incapable of considering each potential sentencing option, including a life sentence. Thus, the Court finds this claim lacks merit.[202]

---

[198] R. 609–11.

[199] R. 614–15.

[200] *Chester I*, Unpublished Appendix, at I.

[201] *Wainwright v. Witt*, 469 U.S. 412, 429 (1985).

[202] More troubling to the Court is the trial court's failure to strike venirewoman Galloway for cause. As Louisiana Supreme Court Chief Justice Calogero explained in his dissent on the denial of a rehearing in Chester's direct appeal,

> Although Ms. Galloway initially indicated that she could consider the aggravating and mitigating circumstances in determining whether a life or death sentence should be imposed, she made it unequivocally clear that she would vote for the death penalty in the case of intentional murder. Galloway specifically stated, "If [the defendant] is proven guilty of murder with specific intent, death penalty." There was no further effort by the state or the trial court to rehabilitate this venirewoman. Although during the state's examination Ms. Galloway indicated that she could listen to the mitigating factors, and in an appropriate case return a life or death sentence, her pronouncement that the death penalty was the

### D. The state trial court's jury charges

Chester argues the state trial court's jury instructions during the guilt phase of trial violated his constitutional rights. Specifically, Chester contends the state trial court's instructions regarding Chester's right to testify own his own behalf, the burden of proof, commutation, and aggregating and mitigation factors, as well as the state trial court's failure to instruct the jury regarding Chester's theory of defense, violated Chester's Sixth Amendment right to a fair trial.

### 1. The state trial court's instruction regarding Chester's right to testify on his own behalf

Chester did not testify on his own behalf at trial. Following closing arguments, the trial court charged the jury as follows with respect to Chester's decision not to testify:

> The defendant is permitted by law to testify in his own behalf. When he does not avail himself of this privilege, you should not consider this fact, or permit it to raise a presumption of guilt against him, and you should consider in determining his guilt or innocence only those facts testified to and brought out in the trial of this case.[203]

Chester argues the trial court should have instructed the jury that Chester has a Fifth Amendment right *not* to testify and that the trial court's instructions impermissibly drew the jury's attention to Chester's decision not to testify.[204] He points to the U.S. Supreme Court's holding in *Carter v. Kentucky*, in which the U.S. Supreme Court held the trial court erred in refusing to instruct jury that defendant had a right not to testify and that the jury could draw no adverse inferences from his decision not to testify.[205]

---

appropriate penalty when a person committed murder with specific intent cas[ts] doubt on her ability to consider life in this case, where a conviction of first degree murder would necessarily require a finding of specific intent to kill.

*Chester I*, 724 So. 2d at 1290–91. However, Chester does not raise the issue in his habeas petition before this Court; therefore, the Court does not consider it.

[203] R. 1646.

[204] R. Doc. 1 at 154–55.

[205] 450 U.S. 288 (1981).

Ultimately, in *Carter*, the U.S. Supreme Court held that "the Fifth Amendment requires that a criminal trial judge . . . give a 'no-adverse-inference' jury instruction when requested by a defendant to do so."[206]

In opposition, the State points to the U.S. Supreme Court's discussion in *Boyde v. California*, wherein the Court explained:

> jurors do not sit in solitary isolation booths paring instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.[207]

The Louisiana Supreme Court found Chester's claim involved the kind of "technical hairsplitting" the U.S. Supreme Court cautioned against in *Boyde*. The Louisiana Supreme Court explained: "Read in its entirety, [the trial court's jury instructions] instructs the jurors that they are not to draw any inference from defendant's decision not to testify."[208] This Court agrees.

Further, the facts in *Carter* are readily distinguishable from this case. In *Carter*, the district court refused entirely to instruct the jury regarding the defendant's right not to testify on his own behalf entirely. In this case, the district court properly instructed the jury that Chester's decision not to testify should not be considered, and that the jury should not "permit it to raise a presumption of guilt against him,"[209] in compliance with *Carter*.[210] As a result, the Court finds the Louisiana Supreme Court's holding is not (1)

---

[206] *Id.* at 300.
[207] *Boyde v. California*, 494 U.S. 370, 380–81 (1990).
[208] *Chester I*, Unpublished Appendix, at XVI, XVII.
[209] R. 1646.
[210] *Carter*, 450 U.S. at 303 ("No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum.").

contrary to and did not involve an unreasonable application of, clearly established Federal law, as determined by the U.S. Supreme Court, nor was it (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[211]

### 2. The state trial court's instruction regarding the burden of proof

Chester next complains the state trial court's jury instruction regarding the definition of reasonable doubt "reduce[d] the State's burden of proof below the standard set by [the U.S. Supreme Court in] *In re Winship*."[212] According to Chester, the court erroneously placed an obligation on Chester to call witnesses and present a defense by instructing the jury that:

> Witnesses are weighed and not counted. Your function is to determine the facts, and this is not done by counting noses. The test is not which side brings the greater quantity of evidence, but rather, which witnesses and which evidence appeals to your minds as being the most convincing.[213]

The Louisiana Supreme Court held that "review of the instruction reveals that it tracks the language in the Louisiana Judge's Criminal Bench Book, Vol I, § 303 (1993) and did not include any terms which would mislead the jury."[214] The Court finds the Louisiana Supreme Court's resolution of this claim was reasonable and not otherwise contrary to AEDPA or U.S. Supreme Court precedent.

### 3. The state trial court's instruction regarding commutation

Next, Chester submits the trial court's instruction regarding the fact that the governor of Louisiana has the power to commute life and death sentences violated his

---

[211] *See* 28 U.S.C. § 2254(d).
[212] R. Doc. 1 at 155 (citing *In re Winship*, 397 U.S. 358 (1870)).
[213] R. 1644.
[214] *Chester I*, Unpublished Appendix, at XIX.

Eighth and Fourteenth Amendment rights.[215] With respect to this claim, the Louisiana Supreme Court found it lacked merit, as "[t]he instruction tracked the language of the statute" and that the Louisiana Supreme Court had "recently found that the statute is constitutional."[216] The Court finds the Louisiana Supreme Court's resolution of this claim was reasonable and not otherwise contrary to AEDPA or U.S. Supreme Court precedent.

### 4. The state trial court's instruction on aggravating and mitigation factors

Chester next contends the trial court instructed the jury that it must "weigh" the aggravating circumstances against the mitigating circumstances in determining the appropriate sentence in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.[217] The trial court provided the following charge to the jury at the close of the sentencing phase:

> You are required to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed. Each individual juror shall weigh the aggravating circumstances found unanimously to exist and any mitigating circumstances found by the individual jurors to exist. . . .

> Even if you find the existence of an aggravating circumstance, you must also consider any mitigating circumstances before you decide that a sentence of death should be imposed. . . .

> However, in addition to those specifically provided mitigating circumstances, you must also consider any other relevant mitigating circumstances which are defined. You may consider any other relevant circumstances which you feel should mitigate the severity of the penalty imposed.[218]

---

[215] R. Doc. 1 at 157.
[216] *Chester I*, Unpublished Appendix, at XXXII (citing *State v. Loyd*, 96-1805 (La. 2/13/97), 689 So. 2d 1321).
[217] R. Doc. 1 at 186.
[218] R. at 1869.

According to Chester, this is an incorrect statement of Louisiana law, and "at best, unclear."[219]

The Louisiana Supreme Court found this claim to be without merit because "Although the court used the word 'weigh' in instructing the jurors, the instruction did not suggest that the jurors balance the number of aggravating circumstances against the number of mitigating circumstances."[220] The Louisiana Supreme Court went on to state: "The record supports a conclusion that the jury understood any weighing as a qualitative rather than a quantitative process."[221] This Court agrees with the Louisiana Supreme Court and finds its resolution of this claim was reasonable and not otherwise contrary to AEDPA or U.S. Supreme Court precedent.[222]

### 5. The state trial court's failure to instruct the jury regarding Chester's theory of defense

Finally, Chester argues the state trial court's failure to instruct the jury that a substance falsely represented as a controlled dangerous substance is not a controlled dangerous substance under Louisiana law.[223] The Louisiana Supreme Court denied this claim as moot. The Louisiana Supreme Court explained:

> Defense counsel argued that defendant admitted in his second statement that he had only fake cocaine or bunk on his person; however, the prosecutor argued that in his first statement, defendant stated he was attempting to sell crack cocaine and that defendant changed his story from selling crack to selling "bunk" to avoid implicating himself in criminal activity. Nonetheless, the trial judge allowed defense counsel to argue the

---

[219] R. Doc. 1 at 187.
[220] *Chester*, Unpublished Appx. at XXXI.
[221] *Id.*
[222] *See State v. Sepulvado*, 93-2692, (La. 4/8/96), 672 So. 2d 158, 168, n.7 (instruction that jurors must weigh the mitigating factors against the aggravating circumstances found was not incorrect when charges were read as a whole, as the instruction did not tell jurors to balance the number of mitigating factors against the number of aggravating factors).
[223] R. Doc. 1 at 156.

issue in closing argument, thus fully informing the jury of the defense. Moreover, considering that the jury only found the aggravating circumstance of attempted armed robbery during the penalty phase it appears that jurors completely rejected the state's drug transaction scenario. Therefore, the trial judge's failure to read the special charge did not prejudice defendant.[224]

This Court agrees with the Louisiana Supreme Court and finds its resolution of this claim was reasonable and not otherwise contrary to AEDPA or U.S. Supreme Court precedent.

## V.     Juror Misconduct

### A.  Improper experimentation

During deliberations following the guilt phase of trial, jurors requested access to "all physical evidence," including photographs of the crime scene and a mannequin head that was used as a prop in the State's case-in-chief. According to Chester, "In a post-conviction interview, foreman John Guillot revealed that jurors attempted to identify the bullet trajectory for themselves by experimenting in deliberations with the State's mannequin prop."[225] Guillot explained the jurors used the prop to determine whether Chester was in fact the shooter.[226] Chester argues this violated his Sixth Amendment right to a fair trial.[227]

On review, the Louisiana Supreme Court held that "Because Chester does not allege that jurors conducted any experiment which effectively gave rise to evidence other than that presented at trial, he fails to show any basis for examining the jury's deliberations as to this issue."[228] In support of his argument that the Louisiana Supreme

---

[224] *Chester I*, Unpublished Appendix, at XVIII.
[225] R. Doc. 1 at 101–02.
[226] *Id.*
[227] *Id.* at 101.
[228] *Chester II*, 208 So. 3d at 350–51.

Court's holding with respect to this claim is unreasonable, Chester points to *United States v. Beach*,[229] a case from the Fourth Circuit. In *Beach*, the Fourth Circuit explained:

> A jury may not conduct experiments which have the effect of putting them in possession of evidence not offered at the trial. Jurors conducting such an experiment are guilty of misconduct warranting a new trial, unless in the circumstances no prejudice results, as where the verdict has already been agreed upon and is clearly right. Improper experiments include experiments with firearms to test the truth of testimony, and ascertainment by jurors for themselves whether voices can be heard out-of-doors, whether signatures can be perfectly traced, or whether a worn shoe would make tracks described at the trial.[230]

Even assuming the rationale in *Beach* applies, which the Louisiana Supreme Court found it did not,[231] Chester has not pointed to any U.S. Supreme Court holding that such juror experimentation violates the Sixth Amendment. The Court will not issue the writ on this basis.

### B. Consulting the Bible

Again pointing to the post-Judgment statement from Guillot, Chester contends a female juror, presumably Iris Gravelee,[232] made her decision to vote in favor of a death sentence only after consulting her Bible.[233] According to Guillot, Gravelee initially indicated she would vote for a life sentence before the jury suspended deliberations for the evening, but when the jury reconvened in the morning, Gravelee had "changed her vote to death" and had "made her decision with her Bible."[234]

---

[229] 296 F.2d 153, 158 (4th Cir. 1961).
[230] *Id.*
[231] *Chester II*, 208 So. 3d at 351 ("However, a review of *Beach* reveals that the rule discussed therein is more nuanced than Chester portrays.").
[232] As the Louisiana Supreme Court explained: "Post-conviction counsel has deduced this is the juror at issue because those who have recounted her actions and statements have consistently described her as 'an older female;' of the jurors, Gravlee best fit that description." *Chester II*, 208 So. 3d at 350 n.7.
[233] R. Doc. 1 at 100.
[234] R. Doc. 1-2 at 21–27.

Chester contends this "external influence" prejudiced him and deprived him of his Sixth Amendment right to a fair trial. Chester points to *Oliver v. Quarterman*,[235] in support of his assertion. In *Oliver*, the Fifth Circuit explained that a Bible will serve as a particularly powerful influence when consulted by jurors during penalty deliberations in a capital trial "precisely because it may . . . influence[] the jurors simply to answer the questions in a manner that would ensure a sentence of death instead of conducting a thorough inquiry into the[] factual areas."[236]

The state district court concluded Chester could not present evidence related to this claim, applying Louisiana Code of Evidence article 606(B), Louisiana's juror shield law. On review, the Louisiana Supreme Court found the district court's application of the juror shield law was erroneous, but nevertheless affirmed the outcome as the Louisiana Supreme Court found the juror's consultation of the Bible did not have a "substantial and injurious effect on the verdict."[237] The Louisiana Supreme Court explained:

> Chester fails to make the required showing of a substantial and injurious effect on the verdict because, although he asserts his post-conviction interviews with Foreperson Guillot and Juror Lawson contained detailed descriptions of their observations of Gravlee's consultation of a Bible after an overnight recess, which allegedly led Gravelee to decide her penalty phase vote, Chester has not provided the necessary proof to substantiate his allegations. Even setting aside whatever practical concerns may arise from the fact that Gravlee has since passed away, no affidavits from Guillot or Lawson were attached as exhibits to the instant application. Because

---

[235] 541 F.3d 329, 336 (5th Cir. 2008).

[236] *Id.* at 340.

[237] *Chester II*, 208 So. 3d at 351 (citing LA. CODE EVID. art. 606(B) ("Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.")).

Chester has not substantiated his assertions, he fails to show any grounds for remand.[238]

Chester contends this holding was an unreasonable factual conclusion, as the Louisiana Supreme Court simultaneously held that (1) the state district court erred in barring Chester from presenting evidence with respect to this claim, but that (2) Chester had failed to present sufficient evidence in support of the claim.[239]

Noting the contradictory nature of the Louisiana Supreme Court's holding, on January 16, 2018, Chester filed a motion for an evidentiary hearing in this Court, arguing he is entitled to a hearing on, *inter alia*, his claim that Ms. Gravlee's consultation of her Bible and subsequent vote in favor of the death sentence violated his Sixth Amendment rights.[240] Under AEDPA, requests for an evidentiary hearing are evaluated under the provisions of 28 U.S.C. § 2254(e)(2).[241] AEDPA allows a federal district court to hold an evidentiary hearing if two conditions are met: (1) the petition's factual allegations, if true, would entitle the petitioner to relief; and (2) for reasons beyond the petitioner's control, the factual claims were not previously the subject of a full and fair hearing in the state court.[242]

The second factor, that the state did not afford Chester a full and fair hearing, is met in this case. Louisiana Code of Criminal Procedure articles 926 and 928 set forth the pleading requirements for post-conviction petitioners. These articles explain that a petitioner's burden in his initial petition is to set forth the factual basis of his claims with

---

[238] *Id.*

[239] R. Doc. 1 at 102.

[240] R. Doc. 43.

[241] *See McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998).

[242] 2254(e)(2); *see Townsend v. Sain*, 372 U.S. 293, 312–13 (1963); *Hall v. Quarterman*, 534 F.3d 365, 367–68 (5th Cir. 2008); *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) (citing *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir. 2000); *Mowad v. Anderson*, 143 F.3d 942, 947–48 (5th Cir. 1998); *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000)).

reasonable particularity and to plead claims which, if established, would entitle him to relief.[243] In turn, if issues of fact exist that cannot be resolved on the pleadings alone, Article 930 requires the Louisiana district court to hold an evidentiary hearing.[244] Thus, under Louisiana law, there is no requirement that a post-conviction petitioner submit affidavits in support of his well-pleaded claims, and therefore, Chester's failure to attach Guillot's affidavit to his state court petition does not bar this Court from considering the claim.

Having found that Chester's factual claims were not previously the subject of a full and fair hearing in the state court for reasons beyond Chester's control, the Court now considers whether Chester has alleged facts that, if taken as true, would entitle him to

---

[243] Specifically, Article 926 states:

A. An application for post-conviction relief shall be by written petition addressed to the district court for the parish in which the petitioner was convicted. A copy of the judgment of conviction and sentence shall be annexed to the petition, or the petition shall allege that a copy has been demanded and refused.

B. The petition shall allege:
   (1) The name of the person in custody and the place of custody, if known, or if not known, a statement to that effect;
   (2) The name of the custodian, if known, or if not known, a designation or description of him as far as possible;
   (3) A statement of the grounds upon which relief is sought, specifying with reasonable particularity the factual basis for such relief;
   (4) A statement of all prior applications for writs of habeas corpus or for post-conviction relief filed by or on behalf of the person in custody in connection with his present custody; and
   (5) All errors known or discoverable by the exercise of due diligence.

C. The application shall be signed by the petitioner and be accompanied by his affidavit that the allegations contained in the petition are true to the best of his information and belief.

D. The petitioner shall use the uniform application for post-conviction relief approved by the Supreme Court of Louisiana. If the petitioner fails to use the uniform application, the court may provide the petitioner with the uniform application and require its use.

E. Inexcusable failure of the petitioner to comply with the provisions of this Article may be a basis for dismissal of his application.

LA. CODE OF CRIM. P. 926. Article 928 states: "The application may be dismissed without an answer if the application fails to allege a claim which, if established, would entitle the petitioner to relief." LA. CODE OF CRIM. P. 928.

[244] LA. CODE OF CRIM. P. 930(A) ("An evidentiary hearing for the taking of testimony or other evidence shall be ordered whenever there are questions of fact which cannot properly be resolved pursuant to Articles 928 and 929.").

relief. In his petition, Chester alleges that while deliberations during the penalty phase of trial were suspended overnight, a juror consulted her Bible outside of the jury room, and the next day changed her vote to death as a result.

Under U.S. Supreme Court case law, the Sixth Amendment forbids a jury from being exposed to external influences during its deliberations.[245] In *Oliver,* the case to which Chester points in support of his claim, the petitioner appealed the district court's denial of a writ of habeas corpus, arguing the jury violated the Sixth Amendment by considering passages from the Bible during the sentencing phase of its deliberations. The Fifth Circuit held that the jury's consideration of the Bible, which was not in evidence, violated the Sixth Amendment. The Fifth Circuit nevertheless affirmed the district court's denial of the writ, stating that "[a]lthough the jury improperly consulted the Bible," the petitioner was not entitled to a writ of habeas corpus, because the petitioner did "not present[] clear and convincing evidence to rebut [the Louisiana court's] factual finding" "that the Bible did not influence the jury's decision."[246]

The factual underpinnings of *Oliver* are significantly more troublesome than the facts Chester alleges, and, even under that scenario, the Fifth Circuit affirmed the denial of the writ. In *Oliver*, several jurors brought Bibles into the jury room with them. Moreover, during deliberations, one juror read several passages aloud to his fellow jurors. As the Fifth Circuit in *Oliver* explained:

---

[245] *See Parker v. Gladden*, 385 U.S. 363, 364-65 (1966) (stating that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted)); *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); *Remmer v. United States*, 347 U.S. 227, 229 (1954) (stating that "private communication, contact, or tampering" with the jury is presumptively prejudicial); *Mattox v. United States*, 146 U.S. 140, 149 (1892) (stating that "in capital cases [ ] the jury should pass upon the case free from external causes tending to disturb the exercise of deliberated and unbiased judgment").
[246] 541 F.3d 329, 331 (5th Cir. 2008).

The question before us is not whether a juror must leave his or her moral values at the door *or even whether a juror may consult the Bible for his or her own personal inspiration during the deliberation process*. This case is also not about whether jurors must forget that, generally, the Bible includes the concept of an "eye for an eye." Therefore, we need not address these issues. Instead, here, several jurors collectively consulted a Bible, in the jury room, and likely compared the facts of this case to the passage that teaches that capital punishment is appropriate for a person who strikes another over the head with an object and causes the person's death.[247]

Chester's allegation that Ms. Gravlee voted for death only after consulting her Bible does not establish a Sixth Amendment violation under *Oliver*. Moreover, although the U.S. Supreme Court has held the Sixth Amendment forbids a jury from being exposed to external influences during its deliberations, it is not clearly established that a juror's consultation of the Bible outside of the deliberation room constitutes such an external influence.

On this point, the lack of U.S. Supreme Court precedent addressing the issue, Justice Thomas's dissent from the denial of *certiorari* in *Hurst v. Joyner* is instructive.[248] In *Hurst*, the petitioner asserted that his constitutional rights were violated when a juror asked her father where she could look in the Bible for passages about the death penalty. The petitioner attached the affidavit of juror Christina Foster, in which she stated she had "often had lunch with [her] father who worked near the courthouse" during the trial and, before deliberations, had asked him "where [she] could look in the Bible for help and guidance in making [her] decision for between life and death." Her father gave her "the section in the Bible where [she] could find 'an eye for an eye.'" Based on this background, the U.S. District Court for the Middle District of North Carolina denied the writ.[249] The

---

[247] *Id.* at 340 (emphasis added).
[248] *Hurst v. Joyner*, 757 F.3d 389, 400 (4th Cir. 2014), *cert. denied sub nom. Joyner v. Barnes*, 135 S. Ct. 2643 (2015).
[249] *Hurst v. Lassiter*, No. 10-725, 2013 WL 1338862 (M.D.N.C. Mar. 31, 2013), *rev'd sub nom. Hurst v. Joyner*, 757 F.3d 389 (4th Cir. 2014).

Fourth Circuit reversed, finding Ms. Foster had inappropriately consulted the Bible in violation of the Sixth Amendment.[250] The State then filed a petition for *certiorari*, which the U.S. Supreme Court denied.[251]

Justice Thomas, who was joined by Justice Alito, dissented from the Court's denial of *certiorari*, explaining:

> One of the all too common errors that some federal courts make in applying § 2254(d) is to look to their own precedents as the source of "clearly established Federal law" for purposes of § 2254(d)(1), even though that provision expressly limits that category to Supreme Court precedents.
>
> The Fourth Circuit's decision in *Barnes*—upon which it relied in *Hurst*—committed the same error. That court reasoned that our decision in *Remmer* "created a rebuttable presumption of prejudice applying to communications or contact between a third party and a juror concerning the matter pending before the jury." But *Remmer* offered no specific guidance on what constituted "the matter pending before the jury." Nevertheless, the Court of Appeals turned to its own precedents to determine whether the moral and spiritual implications of the death penalty as a general matter constituted "the matter pending before the jury." It cited its earlier decisions in *Stockton v. Virginia*, 852 F.2d 740 (4th Cir. 1988), and *United States v. Cheek*, 94 F.3d 136 (4th Cir. 1996), as setting forth a "'minimal standard'" under which "[a]n unauthorized contact between a third party and a juror concerns the matter pending before the jury when it is 'of such a character as to reasonably draw into question the integrity of the verdict.'" Neither of those decisions is a precedent of this Court.[252]

Justice Thomas explained that he would have granted the petition for *certiorari* to correct what he perceived as the Fourth Circuit's error—applying its *own* case law to overturn a state court judgment. Instead, the Fourth Circuit could overturn the state court judgment only based on U.S. Supreme Court precedent, as AEDPA requires.[253]

---

[250] *Hurst*, 757 F.3d at 398.

[251] *Joyner v. Barnes*, 135 S. Ct. 2643 (2015).

[252] *Id.* at 2646.

[253] Notably, the Fifth Circuit in *Oliver*, like the Fourth Circuit in *Hurst*, relied heavily on the U.S. Supreme Court's holding in *Remmer* in concluding a juror's use of a Bible during deliberations violates a defendant's Sixth Amendment rights. *Compare Oliver*, 541 F.3d at 335–37 ("Stemming from these clearly established Supreme Court precedents, it is clear that the prohibition of external influences from *Remmer*, *Turner*, and *Parker* applies to this factual scenario.") *with Joyner*, 757 F.3d at 396, 398 ("Accordingly, we hold, as we did in *Barnes*, that the state court's failure to apply the *Remmer* presumption and to conduct an evidentiary

Because granting a writ of habeas corpus based on this claim—specifically, that a single juror's consultation of the Bible outside of the jury room violates the Sixth Amendment—would be an extension of both U.S. Supreme Court and Fifth Circuit precedent, the Court finds the Louisiana Supreme Court's disposition of this claim was not was contrary to or an unreasonable application of the Supreme Court precedents applicable to juror-influence claims, and this Court will not issue the writ on this basis.

## VI.    Sufficiency of the Evidence

Chester next contends the evidence against him was not sufficient to support his conviction and death sentence.[254] "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"[255]

In this case, at trial, the State presented the testimony of Quinice and Kaprice Pollard, both of whom testified that Chester confessed that he shot Adams. Further, although the validity of the testimony and forensic evidence have since come into question, at trial the State also presented testimony that: (1) Chester had Adams' blood on his hat, and (2) the only way Chester could have gotten Adams' blood on him is if he were the shooter. In determining whether the evidence presented at trial is sufficient to sustain a conviction, the Court must draw all inferences in favor of upholding the jury's verdict:

---

hearing in light of this showing was contrary to or an unreasonable application of the Supreme Court precedents applicable to juror-influence claims."); *see also Oliver*, 541 F.3d at 336 ("Although there are no Fifth Circuit cases directly on point, language from the Eleventh, First, and Sixth Circuits bolsters this conclusion.").
[254] R. Doc. 1 at 171.
[255] *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).

Unless the evidence is of such quality and weight that reasonable and impartial jurors could not arrive at a such a verdict, the findings of the jury must be upheld. [The Court] may not reweigh the evidence, re-evaluate the credibility of the witnesses, nor substitute our reasonable factual inferences for the jury's reasonable inferences. [The Court] must view the evidence in the light most favorable to upholding the jury's verdict and may only reverse if the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary conclusion.[256]

Based on the evidence offered at trial, the Court concludes the Louisiana Supreme Court's determination that the State presented sufficient evidence of Chester's guilt is not objectively unreasonable.

## VII.   Eighth Amendment Claims

Chester complains that solitary confinement and the death penalty constitute cruel and unusual punishment in violation of the Eighth Amendment.[257] Without such a pronunciation from the U.S. Supreme Court, this Court finds Chester's Eighth Amendment claims lack merit.

## VIII.  Cumulative Error Claim

Chester argues his trial was so filled with error as to deprive him of his right to a fair trial.[258] He contends the Louisiana Supreme Court's failure to view each of his claims for cumulative error was contrary to clearly established Federal law, pointing to *Derden v. McNeel*, a case in which the Fifth Circuit recognized an independent claim based on cumulative error.[259] In *Derden*, the Fifth Circuit explained the cumulative error doctrine applies only where "(1) the individual errors involved matters of constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally

[256] *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 369 (5th Cir. 1998) (citing *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir. 1995)).
[257] R. Doc. 1 at 187, 193–201.
[258] *Id.* at 189.
[259] 978 F.2d 1453, 1454 (5th Cir. 1992).

defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"[260] Although some U.S. Courts of Appeals have recognized the cumulative error doctrine,[261] the U.S. Supreme Court has not explicitly done so. Thus, the Louisiana Supreme Court's failure to apply the doctrine to Chester's case was not contrary to clearly established Federal law, as articulated by the U.S. Supreme Court, and the Court will not grant Chester a writ of habeas corpus on this basis.

### IX.    Chester's Ineffective Assistance Claims

At trial, the State based its case against Chester on: (1) the theory that the only way Chester's cap could have gotten blood on it was if Chester was positioned directly behind Adams when the gun was fired, not in the rear passenger seat, as Chester stated to police; (2) the argument that the DNA found on Chester's cap was Adams', and (3) testimony from Quinice and Kaprice Pollard, both of whom testified that Chester confessed to shooting Adams. In addition, the State rested its theory with respect to the blood spatter evidence on: (1) the DNA testing done on Chester's cap,[262] and (2) Sergeant Thornton's testimony that blood spatter from a gunshot wound "blows back" in the direction from which the shot was fired.[263] Chester's counsel presented a single witness to testify on his behalf during the guilt phase.

---

[260] *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[261] *See, e.g., Brown v. Sirmons*, 515 F.3d 1072, 1097 (10th Cir. 2008) ("A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless."); *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) ("Under traditional due process principles, cumulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" (quoting *Donnelly*, 416 U.S. at 643)).

[262] Chester contends he never "conceded" that the cap found at his home was his. This Court finds, however, that the Louisiana Supreme Court's conclusion that the Raiders cap in fact belonged to Chester is entitled to deference.

[263] The Court notes no independent testing of the cab was possible, as the cab was returned to the cab company the morning after the murder and cleaned shortly thereafter. R. 1364–66. State investigators did not photograph the back passenger seat of the cab before releasing the cab back to the King Cab Company.

In his petition for habeas in state court and before this Court, Chester argues his trial counsel rendered ineffective assistance of counsel during the guilt and penalty phases of his trial. In support of this claim, Chester presents several pieces of evidence discovered by his state habeas counsel:

(1) Evidence that Chester's blood can be scientifically excluded from the blood drops found on his cap;[264]

(2) Evidence that the blood found on Chester's cap was likely not Adams' blood and that the statistical probability the blood sample contained Adams' blood is a "scientific nullity";[265]

(3) Evidence that Sergeant Thornton's "description of the phenomenon [blood spatter] and his interpretations of the [blood] stains [in Adams' cab] . . . were inaccurate";[266] and

(4) Evidence that eight witnesses, including an eyewitness, none of whom was interviewed by the defense, would have substantiated Chester's contention that Ratcliff, not Chester, shot Adams and would have offered testimony suggesting Quinice testified falsely.[267]

---

[264] R. Doc. 1-1 at 59–73.

[265] *Id.*

[266] *Id.* at 75–80. Chester also contends "Defense counsel's failure to object to this improper testimony was unreasonable and unsupported by any strategic decision." R. Doc. 1 at 53. The Louisiana Supreme Court found Sergeant Thornton's testimony was admissible, and therefore, Chester's trial counsel's failure to object to it could not constitute deficient performance. Although this Court has serious doubts about whether Sergeant Thornton had the training and experience necessary to offer such a lay opinion, it cannot say the Louisiana Supreme Court's finding that he did possess the requisite training and experience to offer blood spatter testimony is clearly erroneous. As a result, the Court will not grant the writ based on this ineffective assistance claim. *See Clark v. Collins*, 19 F.3d 959 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite.").

[267] R. Doc. 1-1 at 6–21, 37, 109–110, 125, 131, 138–39, 143–44; R. Doc. 1-2 at 16–19. Chester also contends this newly discovered evidence supports his claim of actual innocence. R. Doc. 1 at 30. However, no free-standing claim of actual innocence may form the basis for habeas corpus relief. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404–05 (1993)). The Supreme Court has recognized only that a credible showing of actual innocence may act as a gateway to overcome a procedurally defaulted or untimely filed federal habeas corpus claim and allow for review of the merits. *Id.* at 1931.

Moreover, to meet the actual innocence requirement, a petitioner must present "new evidence" of his innocence and "'show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Id.* at 1935 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). New evidence may be in the form of any "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324; *accord Stroman v. Thaler*, 405 F. App'x 933, 934–35 (5th Cir. 2010) (citing *House v. Bell*, 547 U.S. 518, 537 (2006); *Schlup*, 513 U.S. at 324). Fatal to Chester's claim of actual innocence, however, the Fifth Circuit has held that evidence is "not 'new' [when] it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008). Thus, because the new evidence Chester now offers as proof of his actual innocence was available to Chester at the time of trial, but not discovered due Chester's trial counsel's ineffective assistance, Chester's claim of actual innocence necessarily fails. *See id.*

Chester submits, among other ineffective assistance claims,[268] that trial counsel's failure to (1) present testimony from several witnesses who would have corroborated Chester's assertion that he was not the shooter, (2) challenge Sergeant Thornton's lay blood spatter testimony, and (3) determine the validity of the State's DNA testing before stipulating to its results rendered her performance constitutionally deficient and that those deficiencies prejudiced Chester. The Court considers each claim in turn.

## A. Standard of Review

The clearly established Federal law applicable to Chester's ineffective assistance claim is *Strickland v. Washington*'s familiar two part test.[269] Under *Strickland*, a petitioner must demonstrate (1) that his counsel's performance was deficient and (2) that

---

[268] Chester also alleges counsel's performance was ineffective during (1) the hearing on Chester's motion to suppress his custodial statements, R. Doc. 1 at 123; (2) opening statements, *id.* at 96; and (3) cross-examination of the Pollard sisters, *id* at 132; and that counsel's failure to (4) object to the State's evidence regarding Chester's "flight," *id.* at 135; (5) object to the State's introduction of victim impact evidence at the culpability phase, *id.* at 138; (6) object to inadequate police investigation and procedures, *id.* at 128; and (7) to "tak[e] steps" to remedy the prejudicial impact of portions of Chester's letters to Quinice being admitted into evidence rendered her performance constitutionally deficient, *id.* at 147. The Louisiana Supreme Court found none of these claims warranted relief, as it concluded Chester's trial counsel's performance was adequate. This Court finds the Louisiana Supreme Court's findings on these claims was neither contrary to nor an unreasonable application of Federal law.

Finally, Chester argues his trial counsel's performance was deficient because she failed to offer "sufficient" evidence of Chester's alleged neurological impairments during the penalty phase of trial. *Id.* at 109–15. Chester failed to present this claim to the Louisiana Supreme Court on direct or collateral review. Before this Court, Chester argues he can overcome this procedural bar to relief, as he contends his post-conviction counsel's failure to raise this claim on direct or collateral review in state court constitutes ineffective assistance, citing *Trevino v. Thaler. Id.* at 116, 118 (citing 569 U.S. 413 (2013)).

The Court finds this claim lacks merit, and as a result, Chester's post-conviction counsel was not ineffective for failing to raise it. At trial, Chester's trial counsel presented evidence of his neurological impairments during the mitigation phase. For example, trial counsel offered the testimony of Sarah Deland, M.D. and Beth Denton. R. at 1730–54. Ms. Denton was qualified as an expert in social work and psycho-social history, and Dr. Deland was qualified as an expert in forensic psychiatry. Their testimony presented an overview of Chester's mental health. This Court's review of trial counsel's strategic choices must be highly deferential, and it must be particularly wary of "arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)). Because, essentially, Chester's complaint is that trial counsel was deficient during the penalty phase of trial for failing to present *additional* evidence of Chester's alleged neurological impairment, the Court finds Chester has failed to meet *Strickland*'s two-part test with respect to this claim. *See Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981) ("Complaints of uncalled witnesses are not favored in federal habeas review.").

[269] 466 U.S. 668, 687 (1984).

his counsel's deficient performance prejudiced the outcome of his trial.[270] The petitioner must satisfy both prongs to succeed.[271]

To establish a deficient performance, the petitioner must show that his counsel's representation "fell below an objective standard of reasonableness."[272] The Court applies a highly deferential standard to the examination of counsel's performance, making every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.[273]

The second, or prejudice, prong of *Strickland* requires a petitioner to show that "there is a reasonable probability that, but for trial counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[274]

Because ineffective assistance of counsel claims present mixed questions of law and fact, this Court must defer to the state court's decision rejecting such claims, unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[275] Moreover, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is "doubly" deferential:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review

---

[270] *Id.*
[271] *Id.* at 687.
[272] *Jones v. Jones*, 163 F.3d 285, 301 (5th Cir. 1998) (quoting *Strickland*, 466 U.S. at 688).
[273] *See id.* (quoting *Pitts v. Anderson*, 122 F.3d 275, 279 (5th Cir. 1997)); *see also Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (on ineffective assistance claim, courts judge counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct).
[274] *Strickland*, 466 U.S. at 694.
[275] 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."[276]

The Supreme Court then explained:

Surmounting *Strickland*'s high bar is never an easy task. An ineffective assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The

---

[276] *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citations omitted).

question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.[277]

Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford both the state court and the defense attorney the benefit of the doubt."[278]

## B. The Louisiana Supreme Court's Ruling

In the instant case, with respect to Chester's claims that his trial counsel's failure to interview several witnesses who would have testified favorably for the defense and her failure to challenge Sergeant Thornton's lay blood spatter testimony rendered trial counsel's performance constitutionally deficient, the Louisiana Supreme Court found that *Strickland*'s first prong was met.[279] The court, however, found that Chester had failed to show he was prejudiced by these failures. The court's analysis reads:

> Next, [Chester] asserts counsel's investigation was deficient because she failed to present witnesses whose accounts would have contradicted the state's case and failed to present evidence that would have undermined the state's blood spatter theory and demonstrated Ratcliff was the shooter.
>
> Even if this Court agreed with Chester on some independent review of the omitted evidence, counsel's strategy is unsound only if she failed to adequately investigate the evidence bearing on culpability—taking into account both admissibility and relevance. Thus, counsel was obligated to conduct a thorough investigation or to make a reasonable decision that a particular avenue of investigation was unnecessary under the circumstances. Although Chester has shown that counsel failed to interview the omitted witnesses, and it is not apparent that counsel's actions were the product of a reasonable and sound strategy, because we are not convinced that any of the omitted evidence would have affected the verdict, we cannot find this claim warrants relief.[280]

The Louisiana Supreme Court found that Chester's ineffective assistance claim based on trial counsel's failure to hire an independent expert to evaluate the State's blood

---

[277] *Id.* at 105 (citations omitted).
[278] *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quotation marks omitted).
[279] *Chester II*, 208 So. 3d at 347.
[280] *Id.* 346–47.

evidence did not warrant relief, as Chester failed to show his counsel's failure to challenge the State's evidence prejudiced him at trial. The Louisiana Supreme Court's analysis of this claim reads:

> Chester next claims he was prejudiced by counsel's stipulation that the DNA sample from his baseball cap contained a combination of his and the victim's DNA, and by counsel's failure to expose the inaccuracy of the state's DNA results with an opposing expert opinion. According to his post-conviction expert, who has reviewed the state's DNA data and results (the state's testing consumed the only sample), contrary to the evidence presented, Chester can be excluded as a contributor to the sample tested, and the statistical likelihood that the victim was a contributor is so low as to render the results presented at trial "a nullity."
>
> The District Court correctly dismissed this claim, however, given that Chester does not show he was prejudiced by the alleged missteps. That he can be excluded from a sample collected from his own cap does not exculpate him. Notably, he does not dispute his ownership of the cap. Moreover, his assertion that there is low a statistical probability that the victim was the other contributor is too imprecise to warrant relief in a case in which Chester admitted he was inside the taxi during the shooting.[281]

In sum, the Louisiana Supreme Court held that, although trial counsel's performance "fell below an objective standard of reasonableness"[282] by failing to (1) interview an eyewitness; (2) independently verify the State's DNA testing results; and (3) offer expert blood spatter testimony substantiating Chester's assertion that he was in the back passenger seat and, therefore, not the shooter, Chester was not prejudiced by these failures.

Two Louisiana Supreme Court Justices dissented from the majority's holding, concluding instead that Chester was entitled to an evidentiary hearing on at least some portions of his ineffective assistance of counsel claim. Justice John L. Weimer, with whom Justice Jefferson D. Hughes III joined, wrote:

---

[281] *Chester II*, 208 So. 3d at 347.
[282] *Jones*, 163 F.3d at 301 (quoting *Strickland*, 466 U.S. at 688).

In my view, two of relator's claims of ineffective assistance of counsel require a remand for an evidentiary hearing: (1) that trial counsel's investigation was deficient because of a failure to interview and/or present several witnesses whose testimony would have bolstered a purely argumentative defense; and relatedly, (2) that counsel erred by not presenting any evidence to undermine the state's amateur blood spatter expert, whose opinion testimony put relator in the "shooter's seat" in the murder of a taxi driver. . . .

The prosecution's reliance on the detective to establish so many predicates for placing the defendant in the shooter's seat in the taxi seems to lack scientific validity and seems somewhat amateurish, given the gravity of the question of who was the actual shooter. Thus, without interviewing the potential witnesses who would establish Ratcliff as the shooter, trial counsel instead compounded the significance of her own failure to procure "knowledgeable" expert testimony under her duty as described in *Hinton*, 134 S. Ct. at 1088. . . . Recalling that counsel ultimately presented no witnesses at trial to support the defense's theory that defendant was not the shooter, it is reasonable to infer that had even several of the eight potential witnesses testified in support of that theory, such could have dissuaded the jury from the imposition of the death penalty.

In conclusion, I find that there are serious questions in this death penalty case as to whether trial counsel's performance was inadequate and prejudiced relator to the extent that trial was rendered unfair and the verdict suspect.[283]

With due deference to the Louisiana Supreme Court's holdings, this Court analyzes each of Chester's ineffective assistance of counsel claims in turn, first determining whether counsel's performance was deficient, then determining whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[284] Finally, as this Court must defer to the Louisiana Supreme Court's findings of fact and conclusions of law, the Court considers whether the Louisiana Supreme Court's decision to deny Chester habeas relief based on

---

[283] *Id.* at 355–356.
[284] *Strickland*, 466 U.S. at 694.

these claims was reasonable, requiring the Court to determine whether there is any reasonable argument that Chester's counsel satisfied *Strickland*'s deferential standard.[285]

## C. Whether trial counsel's performance was constitutionally deficient

Chester raises ten issues of error in his ineffective assistance claim, many of which were summarily rejected by the Louisiana Supreme Court. At the outset, the Court notes that, although the Louisiana Supreme Court either gave only a brief justification for its denial of each of Chester's ineffective assistance of counsel claims or offered no analysis at all, the Louisiana Supreme Court's refusal to issue Chester a writ of review based on his ineffective assistance of counsel claims is nevertheless entitled to deference, as "[s]ection 2254(d) applies even where there has been a summary denial."[286] Thus, because "[i]n this circuit, a federal habeas court reviews 'only a state court's "decision," and not the written opinion explaining that decision,'"[287] Chester can satisfy the "unreasonable application" prong of § 2254(d) "only by showing that 'there was no reasonable basis' for the [Louisiana] Supreme Court's decision."[288]

### 1. Failure to Interview Exculpatory Witnesses

In his petition for post-conviction relief, Chester included statements from several witnesses whose potential testimony would have substantiated Chester's contention that, although he was present when Ratcliff shot Adams, he was not the man who pulled the trigger:

---

[285] *Richter*, 562 U.S. at 105.

[286] *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011) (citing *Richter*, 562 U.S. at 101).

[287] *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003) (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc)).

[288] *Cullen*, 563 U.S. at 188. "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Richter*, 562 U.S. at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

### a. Anthony Curtis

At the time of the shooting, Anthony Curtis and a friend were driving down Calhoun Street when they saw Adams' cab stopped on the side of the street. Curtis and his passenger then "heard something that sounded like a gunshot," and slowed down. Suddenly,

> [Curtis] saw [Ratcliff] and [Chester] jump out of the cab. [Chester] ran off, but [Ratcliff] didn't run away. [Ratcliff] stayed there. I saw that [Ratcliff] had a gun in his hand when he jumped out of the cab. Then I saw him tuck the gun in his waistband. After [Ratcliff] tucked in his gun, he stop[p]ed there [and] was talking to people in the area. We had got out the car about the same time. Right around that time, my friend said to me, "[Ratcliff] just killed that cab driver."[289]

### b. Ora Chairs

Ora Chairs, who in 1996 lived near Calhoun Street where Adams was murdered, "learned the cabbie got shot when Ratcliff was running up Filmore, passing [her] home, toward Airline." In the sworn statement she gave Chester's habeas counsel, she explained:

> [Ratcliff] came right over to me, by the porch and I saw blood all over the front of his shirt. I said "man, what happened?" He said to me "the cab driver just got shot." . . . I said "what you doing with blood on your shirt?" And he said "a white man got killed." He pulled off his shirt, but kept it in his hand, and ran off. He just held the shirt—he wanted me to give him a clean shirt, but I said no. He was in a rage—he ran off.[290]

### c. Michelle Robinson

Michelle Robinson was at home the night of Adams' murder. She said that "[a]round 5:30 or 6 in the morning," she heard a knock at her door. It was Chester. "[H]e was so shaken and scared. He was hysterical. He told [Robinson] 'Fella just shot this cab driver.'" Chester told Robinson that after Ratcliff shot Adams, "Fella put the gun in [his]

---

[289] R. Doc. 1-1 at 6–12.
[290] *Id.* 14–21.

mouth and said 'if you tell, I'm gonna kill you.'" According to Robinson, "[a] few nights after [the murder] happened, Teddy stayed by [her] house. He stayed inside the entire time. He was worried about Fella, because Fella threatened Teddy that if Teddy went to the police, Fella could kill Teddy's mom. . . . Fella was a bully and he had Teddy so scared. Fella had bullied Teddy in the past, before [the murder] happened."[291]

### d. Larry Franklin

Detective Sacks interviewed residents at 713 Calhoun Street, the house where the call for Adams' cab came from the night he was killed. Delores Vinnett, the homeowner, denied calling for a cab, but told Detective Sacks that her grandson, Larry Franklin, had also been home at the time. Franklin told Detective Sacks that he knew Ratcliff well and that Ratcliff had "been to [Franklin's] house many times."[292]

### e. Angela Horton

Police began investigating Ratcliff after interviewing Angela Horton, who told them Ratcliff might have been involved with the murder. After showing Horton a line up, Horton "immediately recognized Ratcliff's picture." Based on Horton's tip, the police compared the prints found on Adams' business cards to Ratcliff's, finding a match. Horton told police she got her information from Herman Clay.[293]

### f. Herman Clay

Clay had been incarcerated with Ratcliff at Hunt Correctional Center. "When [he] was locked up with Ratcliff . . . [he] saw people telling him that what he'd done was

---

[291] *Id.* at 37.
[292] *Id.* at 125, 138.
[293] *Id.* at 131.

wrong—[Ratcliff had] sent an innocent man to be executed. Ratcliff never tried to defend himself and just put his head down."[294]

### g. Calvin White

Calvin White was also incarcerated with Ratcliff in 1996 in the Jefferson Parish Prison. They were dorm mates. According to White's affidavit, Ratcliff told White:

> [He] shot a cab driver on Calhoun Street and then blamed it on Teddy. He said that Teddy walked up to the cab driver to try and sell him some drugs. Then, Elbert came up separately and got into the back seat. Elbert was trying to rob the cab driver. Teddy wasn't working with Elbert and didn't know what he was going to do. Teddy didn't have a gun.
>
> After Elbert shot the cab driver, he said that Teddy ran away and hid behind a tree. Elbert said that Teddy was a scared little bitch for hiding behind the tree. He said that he walked up to Teddy and told him that he would kill him if he told anyone what happened.
>
> Elbert said that when the police talked to him, he flipped the script and told them that Teddy was the one who shot the cab driver and he was just walking by. He bragged to me about this a lot. His [sic] said "fuck Teddy." He was just trying to get off the charges. He knew that Teddy was too incompetent to stand up for himself.[295]

### h. Donna LaRocca

Shortly after the murder took place, local cab driver Donna LaRocca recalls picking up two men in Kenner. "[D]uring the ride . . . the [two] . . . males were very polite and wanted to know if the police had any information about Adams' murder. [She] stated that she told the [men] she did not know what evidence the police had, but a reward was going to be offered for [Adams'] killer. The two subjects responded by stating that they hoped the killer got caught because it made it hard for them to get a cab." LaRocca called the police once she saw pictures of Ratcliff and Chester on the news. After being interviewed

---

[294] *Id.* at 143–44.
[295] *Id.* at 109–110.

by police, an officer "showed LaRocca a photographic lineup of Ratcliff and a photographic lineup of Chester. LaRocca was able to identify Ratcliff in the lineup, but not Chester. LaRocca stated that she was positive that Ratcliff was one of the people that she picked up at 525 Richard Street. LaRocca also stated that Ratcliff was a frequent customer of King Cab," the company for which both LaRocca and the victim, John Adams, drove.[296]

### i. Sheryl Nelson

Finally, Sheryl Nelson states that, following trial, Quinice Pollard admitted to lying on the stand. Quinice, nicknamed "Buck," told Nelson:

> She only [perjured herself] because the prosecutors told her that they would put her in jail and take away her child. They [the prosecutors] made Buck change her story. She lied on the stand because she was so afraid that her daughter would be taken away. I was very surprised that Teddy was found guilty, because Buck always told me that he was innocent.[297]

Chester's trial counsel did not interview any of these witness. The Court must determine whether Chester's trial counsel's failure to interview these witnesses rendered her performance constitutionally deficient.

Although it is reasonable to conclude trial counsel either knew or should have known of these witnesses—with the exception of White and Nelson, whose statements are made based on knowledge obtained after Chester's trial—this Court must "make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial."[298] Trial counsel had direct knowledge of Curtis,

---

[296] *Id.* at 138–39.
[297] R. Doc. 1-2 at 16–19.
[298] *See Jones v. Jones,* 163 F.3d 285, 300–01 (5th Cir. 1998) (quoting *Pitts,* 122 F.3d at 279); *see also Lockhart v. Fretwell,* 506 U.S. 364, 371 (1993) (explaining that with an ineffective assistance claim, courts judge counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct) (quoting *Strickland,* 466 U.S. at 690)).

Clay, Franklin, Horton, and LaRocca. In her notes from an interview with Chester that took place on "4/17," trial counsel writes "Anthony Curtis says he saw co-[defendant]."[299] In another set of notes, Chester's trial counsel writes Herman Clay's name on a list of people who had "what [she] need[ed]."[300] Finally, Jefferson Parish's supplemental report on the murder points to Franklin, Horton, and LaRocca as witnesses.[301]

Trial counsel did not, however, have direct knowledge of Chairs or Robinson. Although it is reasonably likely trial counsel could have, through reasonable investigation, discovered Chairs and it is also reasonable to presume Chester informed his counsel of his interaction with Robinson, nothing in the record before this Court or the state courts suggests Chester's trial counsel had any actual knowledge of either witness. As a result, the Court does not consider them.

In sum, looking at the potential witnesses Chester now offers, the Court concludes that, at the very least, Curtis, Franklin, Horton, Clay, and LaRocca were potential witnesses of whom counsel was definitely aware before trial and whose testimony would have been admissible.

In addition to showing trial counsel could have reasonably known about these witnesses and that their testimony would be admissible at trial, "[t]o prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable."[302] "An applicant 'who alleges a failure to investigate on the part of his counsel

---

[299] R. Doc. 1-1 at 107.
[300] R. Doc. 1-1 at 141.
[301] *Id.* at 112–39.
[302] *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010).

must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial.'"[303] In his habeas petition, Chester offers Franklin, Horton, and LaRocca as potential witnesses, but does not demonstrate that any of these three witness would have testified at trial, nor does he establish what their sworn testimony would have been. Moreover, although Chester offers a sworn statement from Clay, it is not clear to the Court that his testimony would be admissible, as much of Clay's statement either constitutes inadmissible hearsay, or references observations Clay made of Ratcliff that took place *after* Chester's trial.[304] Thus, the Court evaluates only whether trial counsel's failure to interview Curtis, whose sworn statement Chester has provided to the Court, constitutes ineffective assistance of counsel.[305]

The Louisiana Supreme Court concluded, "counsel was obligated to conduct a thorough investigation or to make a reasonable decision that a particular avenue of investigation was unnecessary under the circumstances,"[306] and trial counsel's failure to interview any of these witnesses was "not a product of a reasonable and sound strategy."[307] This Court agrees.

Trial counsel's failure to interview Curtis rendered her performance deficient. "*Strickland* simply 'does not require . . . defer[ence] to decisions that are uninformed by

---

[303] *Id.*

[304] Although Clay is who told Horton he believed Ratcliff was involved in the murder, Chester does not offer a statement from Clay explaining why he believed that, nor does Chester explain when Clay and Ratcliff were incarcerated together. It is possible Clay was incarcerated with Ratcliff before trial, but that point is not clear from his sworn statement. R. Doc. 1-1 at 143–44. It is more likely that his conversations with Ratcliff regarding Chester's innocence took place *after* trial. *See id.* at 143 ("People from the neighborhood all knew that Ratcliff set Teddy Chester up and got him on death row, even though Teddy is innocent."). Moreover, with respect to the remaining testimony in his sworn statement, much of this testimony appears to be inadmissible hearsay. *See id.* at 143 ("I heard Quinice Pollard testified against Teddy at trial. She lied because she heard that Teddy was messing around with another woman.").

[305] Chester offered Curtis' testimony in the form of a sworn declaration, in which Curtis states "I would have been available to testify to [the] information [offered in his declaration], because it is the truth." R. Doc. 1-1 at 6.

[306] *Chester II*, 208 So. 2d at 346.

[307] *Id.*

an adequate investigation into the controlling facts and law.'"[308] Even assuming trial counsel believed Curtis would not be a credible witness, such a justification is not reasonable if made before even interviewing the witness.

> [A] failure to interview witnesses is [not] excusable as "a strategic decision" [even] if the witnesses would not have been credible. Acknowledging that a lack of credibility might support a strategic decision not to call a witness to testify at trial, . . . a witness's character flaws cannot support a failure to investigate. Without so much as contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness."[309]

Trial counsel's failure to investigate is particularly egregious in Curtis' case, given that he was an eyewitness who could have potentially pointed to at least one additional eyewitness. "[I]nformation relevant to [the] defense might have been obtained through better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony."[310]

Thus, "mak[ing] every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial,"[311] and "taking into account both admissibility and relevance,"[312] the Court finds trial counsel's failure to interview Curtis, an eyewitness who claims he saw Ratcliff with a gun immediately following the shooting, plainly "amounted to incompetence under prevailing professional norms."[313]

---

[308] *Anderson*, 338 F.3d at 392.
[309] *Id.*
[310] *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994); *see also Anderson*, 338 F.3d at 391 ("[C]ounsel's failure to interview eyewitnesses to a charged crime constitutes 'constitutionally deficient representation.'")
[311] *See Jones*, 163 F.3d at 301 (quoting *Pitts*, 122 F.3d at 279); *see also Lockhart*, 506 U.S. at 371 (quoting *Strickland*, 466 U.S. at 690)).
[312] *Chester II*, 208 So. 3d at 346 (citing *Strickland*, 466 U.S. 690–91).
[313] *Richter*, 562 U.S. at 101; *see also Koon v. Cain*, 277 F. App'x 381, 389 (5th Cir. 2008) ("[T]here is a critical distinction between, on the one hand, failing even to attempt to interview the lone eyewitness to a crime, whose testimony is critical to the defensive theory presented, and, on the other hand, strategically deciding not to call that person to testify based on the results of such an interview.").

## 2. Failing to present expert blood spatter testimony

The Louisiana Supreme Court found trial counsel's failure "to present evidence that would have undermined the state's blood spatter theory and demonstrated Ratcliff was the shooter"[314] rendered her performance at trial constitutionally deficient. This Court agrees.

At trial, the State offered the lay testimony of Sergeant Thornton, who described the concept of blood spatter to the jurors. He explained:

> Spatter is usually—in cases when you have blood product, it could be blood product, it could be blood, it could be tissue, skin, that occurs in a particular direction away from a wound when someone is injured in either a gunshot wound, say, or maybe a knife wound, or even blunt trauma, being hit with a bat of some sort, you will have an effect of product, in this case, spatter, which could be dots or liquid markings that would end up on an object away from the injured person.[315]

The following exchange then took place:

> **Q**: Can you inform the members of the jury, please, what is meant by the term "blow back"?
> **A**: The term "blow back" is a definition that is commonly used in, in areas of forensics and the law enforcement community. The definition basically consists of, in the case of a gunshot wound or when a gun has been discharged in the direction of a person and that person has been hit by a projectile, a bullet, and sustains a wound, usually when, when the projectile strikes the person and the wound is created, a certain amount of blow back will occur. And what that generally is, it could be, again, like I say, a similar consensus with spatter. It could be blood; it could be, from my understanding tissue; it could be hair; it could be bone fragments. And the blow back is these particular matters that will go away from the wound in the direction from where the, in this case, the shot came from.
> And in that instance would be, in the case of this matter, blow back would have occurred towards the back of the vehicle. In this case, the back seat behind the driver's seat, where the victim was sitting.[316]

---

[314] *Chester II*, 208 So. 3d at 347.
[315] R. 1487.
[316] R. 1489–90.

Sergeant Thornton's testimony went unchallenged and at no point did Chester's trial counsel attempt to discredit Sergeant Thornton's blood spatter analysis or present evidence to the contrary.

Based on Sergeant Thornton's testimony, the State contended that, because blood spatter from a gunshot "blows back" to where the shooter is, if Chester were in the back passenger seat of Adams' cab, as he claimed, he could not have gotten blood on him.

At trial, the theory of Chester's defense was that, although Chester was in the cab when Adams was shot, he was not the shooter. The State's theory, based on Sergeant Thornton's testimony regarding blood splatter, was that, because Chester's cap had blood on it, he must have been the shooter. Other than the Pollard sisters' testimony, the fact that Adams' blood was found on Chester's hat was the only evidence the State presented that Chester pulled the trigger. At trial, the prosecutor repeatedly used Sergeant Thornton's testimony as evidence that Chester was lying:

> Blow back, what Sergeant Thornton told you about. And that is—where's that head? Blow back is that when the trajectory, the bullet goes in one way, matter is going to blow back in the same direction.
>
> Remember the testimony from him? Well, I want you to envision Mr. Chester, I mean Mr. Adams, in the cab. Look at that projectory [sic]. Somebody was behind him and to his left, by the left back door, and popped him in the back of his head, put a bullet in his brain and ended his life.
>
> And if your blow back from that, if you imagine him in the cab and you do the blow back on the shooter, that shooter's going to be, what, to the left and in the back of that cab.
>
> Now, by Mr. Chester—a man who's lied to the police, lied to his brother, lied to his girlfriend, lied to everybody—now, but if you're going to believe his story, how did the blood, if he was over here and the blow back goes the same way as the trajectory, how did it get on him? . . . . That's evidence. That's not testimony. That's not memory. That is fact. . . .

[Y]ou have each one of them screaming, "It wasn't me. I didn't do it. I was a witness. He did it." That's what you have. *And the evidence, especially the blow back, points to* [*Chester*].[317]

In his state and federal habeas petitions, Chester presented the testimony of Dr. Stuart H. James, a crime scene and bloodstain analyst, who has been qualified as an expert in these fields throughout the United States.[318] Dr. James states that Sergeant Thornton's "description of the phenomenon and his interpretations of the stains in the instant case were inaccurate" and that his review of the evidence "strongly suggests" the State did not interpret it correctly.[319]

Dr. James found Sergeant Thornton's testimony regarding blowback bloodstain patterns unreliable in two respects. First, Sergeant Thornton failed to point out that blowback is often found on the "shooter's hands, sleeves and front of the exterior clothing worn at the time," but that "[t]here was no evidence of blowback bloodstain patterns on any of [Chester's] clothing,"[320] including Chester's cap. According to Dr. James, the blood on the cap was "a transfer from another object that had blood on it, and not an impact pattern'"[321] and "[g]iven the manner in which Mr. Adams' head slumped between the front seats, there would be ample opportunity for one sitting on either side of the rear seat to receive blood transfer on their person."[322]

Second, Dr. James found that,

[Sergeant Thornton] misinterpreted the bloodstains on the lower rear left passenger door and doorframe. The geometry of the stains indicates that the airborne droplets struck those surfaces at a very low angle and did not originate from the entrance wound of John Adams. Subsequent to his gunshot injury the final position of his head was back between the front

---

[317] R. 1638–40 (emphasis added).
[318] R. Doc. 1-1 at 75.
[319] *Id.* at 79.
[320] *Id.*
[321] *Id.* at 80.
[322] *Id.*

seats, which allowed for a large amount of blood to accumulate on the rear floor of the cab as a result of dripping due to gravity. Due to their directionality, the stains on the lower left rear door originated from a source well below the head of the decedent. Some of the stains may be the result of satellite spatter produced by blood dripping into blood and others from projection produced by someone exiting the rear of the cab on that side. The same is true for the bloodstain patterns on the Guess bag. Thus, these bloodstain patterns have the characteristics of castoff patterns; that is, the pattern is created by blood that is flung from—Or cast from—something that has blood on it. Although neither the cab nor any of its contents was preserved for evidence, the photographs fail to demonstrate any evidence of blowback bloodstain patterns from the entrance wound of the decedent within the confines of the cab.[323]

Dr. James also points out that much of the physical evidence in this case had been compromised. For example, "a gun was collected after being . . . found lying in the grass below a window. Once the gun was photographed, it was apparently picked up with bare hands contaminating the gun for DNA testing."[324] Crime scene investigators also did not test the door handles on the cab for DNA, and "neither the cab nor its contents were preserved for evidence."[325] Additionally, the tested DNA found on Chester's cap was located on the inside of the cap, where one's head goes. Ultimately, Dr. James concludes that,

> The fact that Teddy Chester had blood transfer on his cap in no way proves that he was the shooter. There was no impact spatter on his clothing even though the crime scene was the enclosed area of the vehicle. Though [it] appeared that there were reddish-brown transfer stains on his blue jeans, the crime laboratory did not find blood on this item. Based upon the forensic evidence available, *the evidence does not support Teddy Chester as the shooter in this case.*[326]

In *Harrington v. Richter*, the Court held that trial counsel was not ineffective for failing to consult a DNA expert, given the "number of hypothetical experts—specialists in

---

[323] *Id.* at 79.
[324] *Id.* at 77.
[325] R. Doc. 1-1 at 79.
[326] *Id.* at 80 (emphasis added).

psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines—whose insight might possibly have been useful."[327] In that case, Richter and his co-defendant were charged with the murder of Patrick Klein and the attempted murder of Joshua Johnson. At trial, the prosecution theorized Klein was shot and killed while lying on a living room couch. The defense asserted that Klein and Johnson had been shot in self-defense and that Klein was shot in a bedroom doorway, but had been moved to the couch.

Following the incident, there were several pools of blood throughout the crime scene, which lead to "many factual differences between prosecution and defense versions of the events on the night of the shootings."[328] One pool of blood located in the bedroom doorway was not tested to determine whose blood at was; a blood pool adjacent to that blood pool, however, was determined to consist of only Johnson's blood. Following his conviction, Richter asserted his trial counsel's failure to test the blood found in the doorway warranted relief under *Strickland*. According to Richter, had the blood pool been tested, it would have substantiated his contention that Klein was shot in the doorway.

After exhausting his available remedies in state court, the U.S. Court of Appeals for the Ninth Circuit, sitting en banc, held Richter was entitled to relief, given that his trial counsel failed to consult a DNA expert to determine whose blood was in the bedroom doorway.

The U.S. Supreme Court reversed, finding that "[i]t [wa]s only because forensic evidence . . . emerged concerning the source of the blood pool that the issue could with any plausibility be said to stand apart."[329] Notably,

---

[327] *Richter*, 562 U.S. at 107.
[328] *Id.*
[329] *Id.* at 107.

Blood evidence does not appear to have been part of the prosecution's planned case prior to trial, and investigators had not analyzed the few blood samples taken from the crime scene. But the opening statement from the defense led the prosecution to alter its approach. Richter's attorney outlined the theory that Branscombe had fired on Johnson in self-defense and that Klein had been killed not on the living room couch but in the crossfire in the bedroom doorway. Defense counsel stressed deficiencies in the investigation, including the absence of forensic support for the prosecution's version of events.[330]

The Court further explained:

From the perspective of Richter's defense counsel when he was preparing Richter's defense, there were any number of hypothetical experts [who he could have consulted]. . . . In [habeas counsel's] view Klein's location was "the single most critical issue in the case" given the differing theories of the prosecution and the defense, and the source of the blood in the doorway was therefore of central concern. But it was far from a necessary conclusion that this was evident at the time of the trial.[331]

In *Richter*, the U.S. Supreme Court concluded that trial counsel's performance was not deficient because she could not have reasonably anticipated the need to present at trial expert testimony regarding the composition of the blood pool in question. In this case, however, before trial began, it was clear that whether Chester was on the rear passenger side or driver's side was crucial to the State's case. Before trial, defense counsel knew that, although Chester admitted to being at the scene of the crime, he maintained that he was not the shooter and that he was on the back passenger side of the cab when Adams was shot. Trail counsel knew that the only blood found on Chester was a small speck on his cap. Moreover, the cap having been destroyed, the only physical evidence available to both the prosecution and defense were pictures of the blood spatter in the back driver's side seat. The need for a blood spatter expert's opinion as to whether someone with only a speck of blood on them could have been the shooter and whether

---

[330] *Id.* at 94.
[331] *Id.* at 107.

someone seated in the back passenger side of the car could have been the shooter was clear.

Even "reconstruct[ing] the circumstances of counsel's challenged conduct,"[332] trial counsel's decision not to present expert blood spatter testimony cannot be justified as a valid strategic choice. Given the fact that the only physical evidence the State had to place Chester in the back driver's side of the car was blood spatter evidence, any reasonable trial counsel would have had at least some understanding of the potential importance of such evidence. As Justice Weiner wrote in his dissent: "The prosecution's reliance on the detective to establish so many predicates for placing the defendant in the shooter's seat in the taxi seems to lack scientific validity and seems somewhat amateurish, given the gravity of the question of who was the actual shooter." [333]

The mere fact that counsel might have known that blood spatter evidence could be helpful, yet decided not to present such evidence, does not establish that it was a reasoned, tactical decision. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."[334] "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to . . . strategy."[335]

In this case, there is no evidence that counsel did any investigation into the matter before determining an expert's blood spatter analysis would not have been helpful. The blood spatter evidence in this case was a central issue. The result of trial counsel's failure

---

[332] *Id.*
[333] *Chester II*, 208 So. 3d at 355–56.
[334] *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).
[335] *Id.*

to offer the testimony of a blood spatter expert was for the jury to be told that, without question, Chester could not have been seated in the back passenger-side of the cab, as Chester alleged, when Adams was shot. Thus, "the only reasonable and available defense strategy [in this case] require[d] consultation with experts or introduction of expert evidence."[336] The Court agrees with the Louisiana Supreme Court's determination that trial counsel's failure to consult a blood spatter expert rendered her performance constitutionally deficient.

### 3. Failing to obtain the opinion of an independent DNA expert

Chester next complains that trial counsel's failure to obtain an independent opinion of the State's DNA testing before "blindly stipulating" to its results constitutes ineffective assistance. With respect to trial counsel's failure to consult an independent DNA expert, the Louisiana Supreme Court did not explicitly find counsel's performance was constitutionally deficient, instead resting its holding on an analysis of *Strickland*'s second prong.[337] Thus, the Court assumes the Louisiana Supreme Court found *Strickland*'s first prong was met with respect to this claim. To the extent the Louisiana Supreme Court's opinion can be read as finding counsel's failure to consult an independent DNA expert did not make her performance deficient, the Court finds such a holding is an unreasonable application of *Strickland*.[338]

---

[336] *Richter*, 562 U.S. at 106 ("[C]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. . . . It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts."); *see also Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014); *Soffar v. Dretke*, 368 F.3d 441, 477 (5th Cir. 2004) ("Soffar's defense counsel chose to do nothing about the ballistics evidence. Had they investigated the evidence and consulted a ballistics expert, they would have been able to make a strategic decision as to whether such information would have helped Soffar's defense. As was made evident during the state habeas proceedings, Soffar's defense counsel would not have had to look far to find a ballistics expert who could have provided testimony to aid his defense.").

[337] *See Chester II*, 208 So. 3d at 347 ("Chester does not show he was prejudiced by the alleged missteps.").

[338] *See Strickland*, 466 U.S. at 690–691 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than

The Fifth Circuit has repeatedly cautioned against finding trial counsel's performance constitutionally deficient based on his or her failure to call a witness.

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.[339]

Chester has met this initial hurdle with respect to this claim, offering the detailed expert report of Dr. Randell T. Libby, the contents of which are favorable to Chester's case. Dr. Libby also states that, had he been retained by Chester's trial counsel, he would have been available to testify.[340]

Dr. Libby holds a doctoral degree in the area of molecular genetics, with extensive training and experience in the areas of genotyping procedures and methodologies employed for the purposes of human identification. According to Dr. Libby, although it is *possible* Adams' blood contributed to the mixture tested by the State, the State's conclusions about the statistical probability Adams' blood contributed to the mixture was overstated and misleading. Dr. Libby explained "that the possible number of genotypic contributors to the biological materials [(the tested DNA sample)] is the product of the

---

complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Hinton*, 134 S. Ct. 1088; *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

[339] *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

[340] R. Doc. 1-1 at 59–73; *see Woodfox*, 609 F.3d at 808. In addition to Dr. Libby's testimony, Chester's blood spatter expert also noted the incorrectness of the State's DNA evidence, recommending an independent DNA expert be consulted. R. Doc. 1-1 at 77 (noting several issues with the State's DNA testing, and stating "it appears that there is no complete DNA profile matching Teddy Chester at the D1880 test. Therefore, I recommend this case be reviewed by a DNA expert").

total possible individual combinations at each of the . . . loci, and therefore . . . 145,800 possible genetic types."[341] The results of Dr. Libby's analysis "revealed a low power of identity and consequently a low power of discrimination ranging from a frequency estimate of 1 in 140 individuals to 1 [in] 375 individuals."[342]

Regarding whether Chester could be a contributor to the DNA tested by the state, Dr. Libby notes that, with respect to the blood found on the inside of the cap, "Teddy Chester may be excluded as a contributor to the mixture" because "[Chester's] D1S80-34 allele was NOT observed in the mixture."[343] With respect to the sample found on the bill of the cap, Dr. Libby concludes that "[i]n consideration of all the potential contributors [to the tested DNA], combined with the weak alleles at four of the ten markers on the baseball cap bill, render the conclusions drawn by GenTest to be unreliable."[344]

*Hinton* requires that the selection of an expert witness be a "'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts," is "virtually unchallengable."[345] However, this rationale does not apply when, as here, trial counsel makes no investigation and, based on that lack of investigation, does not hire any expert at all, let alone a minimally qualified one.

In this case, trial counsel did not investigate the possibility of hiring an independent expert to refute the State's assertion that the DNA belonged to both Adams and Chester, rendering her performance constitutionally deficient. To the extent the Louisiana Supreme Court's opinion can be read as finding trial counsel's failure to independently verify the validity of the State's DNA results did not constitute ineffective

---

[341] R. Doc. 1-1 at 68.
[342] *Id.* at 69.
[343] *Id.* at 63, 68.
[344] *Id.* at 70.
[345] *Hinton*, 134 S. Ct. at 1089 (quoting *Strickland*, 466 U.S. at 690).

assistance, the Court considers whether "'there was no reasonable basis' for the [Louisiana] Supreme Court's decision."[346]

It is possible the Louisiana Supreme Court determined trial counsel made a reasonable, strategic decision based on the information given to her by the State—that the blood on Chester's cap belonged to both Chester and Adams. Based on this information, trial counsel could have believed that challenging the State's medical evidence would have been futile, and that, therefore, the most effective defense would be to stipulate to the physical evidence, instead of having the State offer its DNA expert as a witness, thereby placing a greater emphasis on the fact that Chester had the victim's DNA on him.

In considering this argument, this Court judges the reasonableness of defense counsel's purported "strategic decision" "in terms of the adequacy of the investigations supporting it."[347] This Court finds Defense counsel's supposed decision not to investigate the State's DNA findings before stipulating to their validity is unreasonable; defense counsel made this decision without having investigated whether the State's expert was correct and lacked sufficient information to reasonably determine that such an investigation was not necessary.[348]

> "[M]indful that 'the range of reasonable professional judgments is wide,' courts recognize that '[i]neffectiveness is generally clear in the context of a complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when

---

[346] *Cullen*, 563 U.S. at 188. "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Richter*, 562 U.S. at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

[347] *Wiggins*, 539 U.S. at 521.

[348] It is apparent that trial counsel was aware of the importance of the State's DNA evidence, given that the Louisiana trial court held a hearing on its admissibility on March 5, 1997, approximately two months before trial. R. 335. At the hearing, the State's DNA expert testified that "1 in 339 Caucasians" have the two markers observed in the profile that were consistent with Mr. Adams' DNA, R. 386, adding "I am comfortable giving those numbers, even though they are very modest. But I would rather be more conservative in my estimates, which I usually am, than trying to give a number that is difficult to defend," *id.*

[she] has not yet obtained the facts on which such a decision could be made.'"[349]

This is not a case in which counsel made a reasonable decision to cease further investigation as a result of having "uncovered . . . evidence . . . to suggest that" challenging the State's DNA evidence "would have been counterproductive, or that further investigation would have been fruitless."[350] Nor is this a case of "diligent counsel . . . draw[ing] a line when they have good reason to think further investigation would be a waste."[351] Rather, trial counsel in this case never discovered any evidence to suggest one way or another whether a challenge to the State's DNA evidence would be wasteful.[352] As the U.S. Supreme Court has cautioned:

> Prosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts, noting that "[s]erious deficiencies have been found in the forensic evidence used in criminal trials. . . . One study of cases in which exonerating evidence resulted in the overturning of criminal convictions concluded that invalid forensic testimony contributed to the convictions in 60% of the cases." This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses; it is maximized when the defense instead fails to understand the resources available to it by law.[353]

In this case, trial counsel settled on a defense strategy without consulting a single expert and cut off further investigation of other strategies without first conducting any

---

[349] *Anderson*, 338 F.3d at 391.

[350] *Wiggins*, 539 U.S. at 525.

[351] *Rompilla v. Beard*, 125 S. Ct. 2456, 2463 (2005).

[352] *See Wiggins*, 539 U.S. at 527 ("[The Maryland Court of Appeals] did not conduct an assessment of whether the decision to cease all investigation upon obtaining the PSI and the DSS records actually demonstrated reasonable professional judgment. The state court merely assumed that the investigation was adequate. In light of what the PSI and the DSS records actually revealed, however, counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible.").

[353] *Hinton*, 134 S. Ct. at 1090 (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 319 (2009) (citing Bramdon L. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 Va. L. Rev. 1, 14 (2009))).

investigation whatsoever into the possibility of challenging the prosecution's DNA evidence. Because counsel never investigated an alternative approach, counsel did not have any reasoned basis to conclude that a challenge to the State's DNA evidence would be fruitless.

In *Richter*, the U.S. Supreme Court also considered the possibility that defense counsel's decision *not* to have the blood tested was itself strategic.

> [C]oncentrating on the blood pool carried its own serious risks. If serological analysis or other forensic evidence demonstrated that the blood came from Johnson alone, Richter's story would be exposed as an invention. An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense. Here Richter's attorney had reason to question the truth of his client's account, given, for instance, Richter's initial denial of involvement and the subsequent production of Johnson's missing pistol. It would have been altogether reasonable to conclude that this concern justified the course Richter's counsel pursued.[354]

Unlike the situation in *Richter*, investigating whether the State's DNA results were valid by consulting an independent expert did not "carr[y] its own serious risk" in this case. The State's testing concluded Chester and Adams' blood "could not be excluded" from the tested sample. An independent evaluation of the State's DNA testing would have either confirmed this fact, or, as habeas counsel has discovered, shown that, in fact, Chester can be scientifically excluded as a contributor to the sample and the possibility that Adams' blood contributed to the sample is a "scientific nullity." Thus, the investigation would not have been "fruitless" or potentially harmful to the defense—it had only the potential to assist in Chester's defense.

Defense counsel may not fail to conduct an investigation and then rely on her resulting ignorance to excuse her failure to explore a strategy that would likely have

---

[354] *Richter*, 562 U.S. at 108.

yielded exculpatory evidence.[355] For counsel to forgo even an investigation of the possibility of challenging the State's DNA evidence, evidence the State heavily relied upon to show Chester was the shooter, was not an objectively reasonable performance.[356] There was nothing strategic about a decision to concede the physical evidence, with no educated basis for doing so.

### 4. Conclusion

In sum, with deference to the Louisiana Supreme Court's holdings on *Strickland*'s first prong, this Court finds trial counsel's failure to (1) interview Curtis, an eyewitnesses who would have testified favorably to Chester's defense; (2) present evidence that would have undermined the state's blood spatter theory; and (3) hire an independent DNA analyst prior to stipulating to the State's DNA evidence, independently constitute "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[357] Accordingly, with respect to these three errors, the Court must examine whether the Louisiana Supreme Court's determination that Chester was not prejudiced by these errors was either contrary to or an unreasonable application of *Strickland*'s second prong.[358]

### D. Whether there is a reasonable probability trial counsel's efficient performance effected the jury's guilty verdict

---

[355] *Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

[356] *See Soffar*, 368 F.3d at 476 ("We also agree with Soffar that his defense counsel were deficient in not seeking out a ballistics expert when there were such readily apparent discrepancies between the ballistics evidence and the State's theory of the case. The State's theory relied heavily on ballistics evidence to show a correlation between the statement attributed to Soffar and the crime scene. Yet Soffar's defense counsel never even consulted with a ballistics expert.").

[357] *Strickland*, 466 U.S. at 687.

[358] *See* 28 U.S.C. § 2254(d). The Court notes that the same three claims of ineffective assistance it finds have merit are the same three claims on which the Louisiana Supreme Court found Chester had met *Strickland*'s first prong.

Under *Strickland*'s second prong, Chester must establish "prejudice." In other words, Chester must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[359] A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."[360] In determining whether prejudice has resulted from counsel's errors, a court "must consider the totality of the evidence before the jury . . . a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."[361] Deference to a state court's conclusion that any deficiency did not result in prejudice requires this Court to ask whether such a determination by the state court "would be unreasonable."[362]

### 1. Failure to interview Curtis

At trial, the State's case rested primarily on (1) the State's unchallenged DNA evidence; (2) unchallenged lay testimony that blood spatter "blows back" in the direction from which it came; and (3) the Pollard sisters' inconsistent testimony that Chester confessed to killing Adams the night of Adams' murder. No eyewitnesses testified at trial, and the only witness who testified for the defense during the guilt phase of trial was Chester's brother, Darren Chester. Darren testified he was home on the night of Adams' murder, and, contrary to Quinice's testimony, that Quinice and her baby were both at the apartment with him when Chester came home that night.[363]

---

[359] *Strickland*, 466 U.S. at 694.
[360] *Id.*
[361] *Id.* at 696.
[362] *Premo v. Moore*, 131 S. Ct. 733, 744 (2011); *see also Harrington*, 131 S. Ct. at 792 (holding that "[i]t would not have been unreasonable" for the state court to conclude that the petitioner's evidence of prejudice did not make it "reasonably likely" that the result would have been different).
[363] R. 1594–96.

There is a reasonable probability that "but for" trial counsel's failure to interview or present the testimony of Curtis, the result of the proceeding would have been different. Curtis is the only person on the record before this Court, and before the Louisiana Supreme Court, who actually witnessed the shooting.[364] Certainly, his testimony would have been a powerful rebuttal to the State's assertion that Chester was the shooter. Thus, looking at trial counsel's failure to interview Curtis, Chester has established the requisite cause and prejudice required to establish ineffective assistance of trial counsel.

This is not the end of this Court's analysis, however; this constitutional deficiency must be viewed through AEDPA's highly deferential lens. Following the Fifth Circuit's instructions in *Neal*, this Court looks only to the "ultimate legal conclusion that the state court reached and not [to] whether the state court considered and discussed every angle of the evidence."[365] The Court finds the Louisiana Supreme Court's legal conclusion that it was not reasonably likely Curtis's eyewitness testimony would have impacted the jurors' decision on Chester's guilt is an unreasonable application of *Strickland*.

At trial, the State had relatively little evidence demonstrating Chester's guilt and did not offer any eyewitness testimony. The State rested its case on two drops of blood found on Chester's hat, lay testimony that blood from a gunshot wound "blows back" towards the shooter, and two witnesses who testified Chester confessed to shooting Adams, one of whom was impeached by a prior statement in which she stated Chester told her Ratcliff shot the cab driver, and the other's testimony was contradicted by the testimony of the Defense's only witness. In defense, Chester offered no evidence to

---

[364] With, of course, the exception of Chester, Ratcliff, and Adams.
[365] *Neal*, 286 F.3d at 246.

corroborate his version of the shooting—that, although he was in the cab, Ratcliff shot Adams.

Curtis' testimony that Ratcliff exited the cab, tucked a gun in his waistband, and left the scene only after rummaging through Adams' cab, when added to the evidence presented to the jury—that Ratcliff's plastic bag was found hanging from the rear driver's side door and that Ratcliff's fingerprints were on the business cards found in Adams' cab—undermines confidence in the outcome. The Louisiana Supreme Court's finding to the contrary is unreasonable. This is not a case in which the evidence of Chester's guilt is so extensive as to render harmless defense counsel's errors. To the contrary, the State predominately relied on blood spatter, DNA evidence, and the Pollard sisters' testimony that directly conflict with Curtis' account of the murder. This conflicting evidence is particularly important, given that Curtis was the sole witness to the crime.[366]

The Court concludes trial counsel's failure to interview and present Curtis's eyewitness testimony rendered her performance constitutionally deficient and that this failure prejudiced Chester at trial. The Louisiana Supreme Court's conclusion to the contrary was an unreasonable application of *Strickland*.

### 2. Blood spatter expert

At trial, the State argued Chester had to have been the shooter if he had any "blow back" on him. The State's position is supported only by assuming the jury would have indulged every possible inference in favor of the prosecution's evidence as to whether Chester could have been in the back passenger seat, as he claimed, when Adams was shot. If the issue in this case were whether there is sufficient evidence on the record to support

---

[366] The Court notes that in his affidavit, Curtis states that he was with another person when he witnessed the crime. Had Chester's trial counsel interviewed Curtis, it is reasonable to conclude defense counsel would have had not one, but two eye-witnesses to corroborate Chester's version of events.

Chester's conviction, the Court would resolve all such inferences in the State's favor. The standard for determining prejudice on a *Strickland* claim, however, is whether there is a reasonable probability that the outcome would have been different if the jury had heard Dr. James' expert blood spatter testimony. Post-trial, Dr. James has presented blood spatter evidence, that the jury did not hear, supporting Chester's claim that he was seated in the back passenger side of the car and, more importantly, that the blood spatter evidence suggested Chester was not the shooter.

As Dr. James' testimony demonstrates, expert blood spatter analysis would have provided physical evidence supporting Chester's claim that he was not the shooter. In the absence of this evidence, Chester's defense theory lacked *any* evidence in its support, and the State made much of its blood spatter evidence at trial, asking the jury "[I]f you're going to believe [Chester's] story, how did the blood, if he was over here and the blow back goes the same way as the trajectory, how did it get on him?"[367]

Chester's only evidence, physical or otherwise, was his brother's testimony that Chester did not mention the murder to his brother and that Quinice was at the brother's house that night, not at Kaprice's house, as Quinice had testified. Darren's testimony was easily discredited when he admitted he was not sure whether the night Quinice was at his house was actually the night Adams was killed. Sergeant Thornton's testimony was the evidence the State used to demonstrate Chester was in the back driver's side seat and, therefore, the shooter. Without any evidence contradicting Sergeant Thornton's assertion, the jury was left to conclude the State's theory was correct. Thus, the Court

---

[367] R. 1638.

finds that, had trial counsel presented Dr. James' expert testimony, there is a reasonable probability the jury's verdict would have been different.[368]

The Louisiana Supreme Court's holding that Chester was not prejudiced is an unreasonable application of *Strickland*. The only evidence the State presented that placed Chester in the "shooter's seat" was the blood spatter evidence detailed in Sergeant Thornton's lay testimony. It is unreasonable to conclude that defense testimony from a blood spatter expert refuting the State's lay witness's interpretation of the blood evidence likely would not affect the jury's verdict.

### 3. DNA expert

Defense counsel did nothing to independently verify the accuracy of the State's DNA testing, but nevertheless elected to stipulate that the blood sample was "a combination of [Chester's] DNA and the victim's DNA."[369] At trial, witnesses for the State and the prosecutor himself repeatedly overstated the DNA test's conclusions. For example, Detective Sacks testified that the results of the DNA testing revealed that "in fact, . . . *it was the victim's blood*" on Chester's cap,[370] and during opening statements, the State told the jury that the blood found on Chester's cap "was tested by DNA experts, and . . . the blood on the cap that was found *was the blood of John Adams*, the victim."[371] Had defense counsel offered evidence that, in fact, Chester's DNA could be excluded from the sample and that, although it was possible, it was highly unlikely Adams' blood

---

[368] *See Draughon v. Dretke*, 427 F.3d 286, 295-97 (5th Cir. 2005) (counsel ineffective for failing to retain a ballistics expert where expert could have shown state's evidence was incorrect); *Soffar v. Dretke*, 368 F.3d 441, *as amended by* 391 F.3d 703 (5th Cir. 2004) (counsel ineffective for failing to consult ballistics expert and living witness who could have countered false confession); *Rivas v. Fischer*, 780 F.3d 529 (2d Cir. 2015) (counsel ineffective for failing to adequately investigate and present evidence challenging the testimony of the medical examiner concerning the time of death); *Thomas v. Clements*, 789 F.3d 760 (7th Cir. 2015) (counsel ineffective for failing to consult with a pathologist or other medical expert).

[369] R. 1297.

[370] R. 1547.

[371] R. 1306.

contributed to the sample, in this Court's estimation it is reasonably likely that this evidence would have swayed the jury in Chester's favor.

Before this Court can find Chester was prejudiced by counsel's failure, however, the Court must consider every reasonable basis for the Louisiana Supreme Court's finding Chester was not prejudiced.[372] In its opinion, the Louisiana Supreme Court found Chester was not prejudiced because: (1) Chester admitted to being in the cab when Adams was shot, and, (2) although it is unlikely Adams' blood contributed to the tested sample, Adams could not be excluded as a donor. Taking the State's contention that the blood spatter from the gunshot wound could not have "blown back" on the passenger side of the vehicle as true, the State's assertion that the blood on Chester's cap was, without question, "the blood of John Adams, the victim,"[373] places Chester *irrefutably* in the shooter's seat. That, in reality, there was only a small chance the blood found on Chester's cap might belong to Adams draws the State's placement of Chester in the shooter's seat into question.

The State based its case on the fact that, although there was no blood found in the back passenger side of the cab, Chester had Adams' blood on his person. If, in fact, Chester *did not* have the victim's blood on him, the State's theory of the case would have been squarely discredited and the evidence would have corroborated Chester's version of events; namely, that he was seated in the passenger side, and therefore, could not have been the shooter. As a result, the Court finds no reasonable basis on which the Louisiana Supreme Court could have rested its conclusion that the addition of Dr. Libby's testimony likely would not have affected the jury's verdict.

---

[372] *See Anderson*, 338 F.3d at 390.
[373] R. 1306.

### 4. Cumulative Effect of Trial Counsel's Errors

Chester argues the Louisiana Supreme Court's failure to consider the combined prejudicial effect of each of trial counsel's deficiencies constitutes an unreasonable application of clearly established Federal law. In support of this argument, he submits that "*Strickland* repeatedly describes a single ineffective assistance of counsel claim as consisting of multiple errors or omissions that result in prejudice to the accused"[374] and points out that the U.S. Supreme Court's discussion of trial counsel's errors in *Williams v. Taylor*[375] and *Wiggins v. Smith*[376] demonstrates that this Court must evaluate *Strickland*'s second prong with respect to the cumulative effect of each finding of ineffective assistance.

Chester's contention finds support in Fifth Circuit precedent. In *White v. Thaler*,[377] the Fifth Circuit considered "[t]he combined prejudicial effect" of counsel's errors in its evaluation of *Strickland*'s prejudice prong.[378] Similarly, in *Richards v. Quarterman*,[379] the Fifth Circuit considered "each aspect of [counsel's] performance the district court found deficient" before determining whether the petitioner "was cumulatively prejudiced thereby."[380] In *Moore v. Johnson*,[381] the Fifth Circuit framed *Strickland*'s second prong

---

[374] *See, e.g.*, *Strickland*, 466 U.S. at 693 ("Even if a defendant shows that particular *errors* of counsel were unreasonable . . . the defendant must show that *they* actually had an adverse effect on the defense.") (emphasis added); *id.* at 694 (holding that a petitioner must show "a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis added).
[375] 529 U.S. at 395–96 (treating multiple unprofessional errors as a single claim of "trial counsel['s] [failure to] fulfill their obligation to conduct a thorough investigation of the defendant's background").
[376] 539 U.S. at 534 (noting that for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's "*failures*" prejudiced his defense (emphasis added)).
[377] 610 F.3d 890 (5th Cir. 2010).
[378] *Id.* at 912.
[379] 566 F.3d 553 (5th Cir. 2009).
[380] *Id.* at 564.
[381] 194 F.3d 586 (5th Cir. 1999)

as requiring a court to determine "whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable."[382]

That a court should evaluate the cumulative effect of trial counsel's errors appears to be clearly established in the Fifth Circuit. Thus, had Chester been convicted in Federal court, this Court would agree that *Strickland*'s second prong must be evaluated cumulatively. In the case of a habeas petitioner seeking relief from a state court conviction, however, and with due respect to the Fifth Circuit, this Court must consider whether the rule in question is clearly established by the U.S. Supreme Court, not a U.S. Court of Appeals.

Although the U.S. Supreme Court's use of the plural "errors" in the prejudice context suggests *Strickland*'s prejudice prong should be evaluated cumulatively, this Court cannot say such a requirement is clearly established by U.S. Supreme Court precedent.[383] Accordingly, the Court finds the Louisiana Supreme Court's failure to evaluate the cumulative effect of counsel's errors was not contrary to or an unreasonable application of clearly established Federal law in the AEDPA context.[384]

### 5. Conclusion

---

[382] *Id.* at 619; *see also id.* at 621 (finding that counsel's errors "taken together," "including counsel's performance during the guilt phase, prejudiced the outcome of the punishment phase of Moore's trial"). Other circuits have made similar statements. *See, e.g.*, *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an [ineffective assistance of counsel] claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'") (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)); *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) ("Rather than evaluating each error in isolation, . . . the pattern of counsel's deficiencies must be considered in their totality.").

[383] *See Lopez v. Smith*, 135 S. Ct. 1, 1 (2014) ("We have emphasized, time and again, that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established.'"); *see also* Ruth A. Moyer, *To Err is Human; to Cumulate, Judicious: The Need for U.S. Supreme Court Guidance on Whether Federal Habeas Courts Reviewing State Convictions May Cumulatively Assess* Strickland *Errors*, 61 DRAKE L. REV. 447 (2013).

[384] *See* 28 U.S.C. § 2254(d).

The Court holds that the Louisiana Supreme Court unreasonably applied *Strickland* and its progeny when it concluded Chester was not prejudiced by his trial counsel's ineffective assistance with respect to her failure to interview Curtis, to challenge the State's blood spatter evidence, and to independently verify the validity of the State's DNA testing. With respect to those three claims, the Court concludes "there was no reasonable basis" for the Louisiana Supreme Court's decision to the contrary.

Accordingly;

## CONCLUSION

**IT IS ORDERED** that Teddy Chester's petition for a writ of habeas corpus be and hereby is **GRANTED**.[385]

**IT IS FURTHER ORDERED** that within 120 days of this Order, the State of Louisiana either retry Teddy Chester or set him free.

**New Orleans, Louisiana on this 11th day of June, 2018.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT COURT JUDGE**

---

[385] R. Doc. 1. Having granted the writ, the Court **DENIES** Petitioner's motion for an evidentiary hearing as **MOOT**.